# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
## PANAMA CITY DIVISION

**UNITED STATES OF AMERICA**

**v.**                                  **Case Nos.:   5:12cr25/MW/CJK**
                                                      **5:14cv34/MW/CJK**

**BRENNON KYLE HOLLEY**

_____/

## REPORT AND RECOMMENDATION
## THAT RELIEF BE GRANTED TO FEDERAL PRISONER

This case is before the court on Defendant Brennon Holley's amended motion to vacate, set aside, or correct sentence, as supplemented.   (ECF Nos. 34, 57).   The matter has been briefed on multiple occasions.   Mr. Holley filed an amended motion to vacate pursuant to 28 U.S.C. § 2255, to which the Government responded and he replied.   (ECF Nos. 34, 39, 41).   Defendant filed a supplement pursuant to court order (ECF No. 47), and on May 28, 2015, the court entered a detailed order appointing the Office of the Federal Public Defender to represent Mr. Holley in this case.   (ECF No. 49).   Following this, counsel filed a supplemental motion to vacate, to which the Government responded and Mr. Holley replied.   (ECF Nos. 57, 62, 68, 75).   The parties filed a Joint Pre-hearing Stipulation and Summary

Case 5:12-cr-00025-MW-CJK   Document 91   Filed 08/24/16   Page 2 of 44

Page **2** of **44**

(ECF No. 78), and the court held an evidentiary hearing on May 11, 2016 (ECF No. 85), after which the parties filed closing memoranda.    (ECF Nos. 88-90).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters. *See* N.D. Fla. Loc. R. 72.2; *see also* 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b). After a careful review of the record and the arguments presented, it is the opinion of the undersigned that Mr. Holley's counsel was constitutionally ineffective and that the § 2255 motion should be granted and Mr. Holley permitted to withdraw his guilty plea.

## PROCEDURAL BACKGROUND

The Underlying Case

As a result of a state undercover sting operation, the Government charged Defendant Brennon Holley on August 22, 2012, in a single count indictment with using a means of interstate commerce to knowingly attempt to persuade, induce, and entice an individual under the age of 18 to engage in sexual activity.    (ECF No. 1).    The undersigned entered an order of temporary detention (ECF No. 8), and U.S. Magistrate Judge Bodiford held a detention hearing on September 5, 2012.    (ECF No. 12). Retained counsel James Burns represented Mr. Holley.    Assistant United

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

States Attorney (AUSA) Kathryn Risinger appeared for the Government.   The court did not enter a written final order with respect to detention, but the Minute Entry reflects the court ordered Defendant detained based on the allegations of the current case and advised defense counsel to file a motion for rehearing if necessary. The entry also reflects "Court discussion re previous case; current case."   (ECF No. 12).

The details of what transpired at, and after, the detention hearing are relevant to Mr. Holley's ineffective assistance of counsel claim.   The transcript of the detention hearing reveals the Government represented it was trying to locate information about an incident that occurred in 2000, allegedly involving "a sexual assault, battery of a victim over 12 years of age by physical force."   (ECF No. 54). The AUSA represented that different records appeared to show different things, but stated she had at least one arrest memorandum or report detailing that Defendant met a "girl" on the internet and they talked for a few months before going out, when Defendant "forced her to have sex with him at, I believe, knifepoint."   (ECF No. 54 at 6).

The Government emphasized it did not want to mislead the court and was unsure what happened with the charges, but noted there was "at least one prior

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

allegation of an incident involving sexual activity with a minor."   (*Id*. at 6, 7).   Mr. Burns said he understood the 2000 charge was *nol prossed*.   He stated he had seen the report and it was "readily available if [the Government] wanted to have it here today."   Counsel also noted he did not recall anything about knifepoint.   Mr. Burns argued that in light of the fact the charge was dropped, the magistrate judge should not consider the statements made by the Government as evidence in the detention proceeding.   (*Id*. at 7-8).   The court inquired why the Government was having difficulty tracking down the 2000 case.   The Government indicated it had been shuffled between different police departments due to the age of the report, but it was still attempting to locate it and thought it would take a few days to obtain the information.   (*Id*. at 9-10, 12).   The Government twice maintained the allegation would constitute Rule 404(b) information in Defendant's federal case and asked that the court recognize it.   (*Id*. at 10).   Defense counsel noted at least twice during the proceeding that online court records were readily available; he also argued the allegation was remote in time and factually dissimilar.   (*Id*. at 10, 16).

Judge Bodiford indicated it was important for the court to have a complete picture of what happened in 2000 and the record would be incomplete without some official information.   (*Id*. at 11-12).   Absent this information, the court noted the

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

penalty Defendant faced, ten years to life, was one of the criteria that triggered pretrial detention and that its order of detention was "based upon the allegations in [the] indictment."   (ECF No. 54 at 14).   However, the magistrate judge also told Mr. Burns if he could find something that would clarify what happened in 2000, or if he came up with anything new, he should feel free to file a motion for a rehearing, at which point the court would reopen the proceedings.   In response to the Government's request for clarification with respect to the weight the court gave the alleged incident that occurred in 2000, the court stated "At this point in time what happened in 2000 may be important to me.   I don't know."   (ECF No. 54 at 14-15).   Judge Bodiford again noted the allegations in the case at bar, the age of the purported victim, and Defendant's ties to the community provided the basis for the decision.   He then reiterated "But I'm not saying that what happened in 2000 will not change my mind."   (*Id*. at 15).   The Government repeated its assurance it would have its investigator look into the matter.

In closing, the court stated "today's announcement of community safety and ten years to life" as the basis for detention was "not prejudicial to [counsel] reopening this matter" and indicated its dissatisfaction with knowing there was a prior charge but not knowing the disposition of that charge.   (*Id*. at 15).   Judge

Bodiford advised the court would enter the order subject to counsel moving to reopen, and he admonished the parties not to drag their feet. The Government again assured the court it would ensure its investigator got on it and that if the investigator learned something, it would notify the court.    (*Id.* at 16).    The court's electronic record reflects neither an update from the Government nor a motion by Mr. Burns to reopen the proceedings.    Instead, approximately a month and a half later, Defendant entered a plea of guilty pursuant to a written plea agreement.    (ECF Nos. 15-17).

Mr. Holley's plea agreement was unremarkable.    The agreement provided he faced a minimum mandatory term of ten years imprisonment.    (ECF No. 15 at 1). The document included a standard provision noting Defendant gave up certain rights by pleading guilty and Defendant was pleading guilty because he "is in fact guilty of the charges alleged in Count One of the Indictment."    (*Id.* at 2).    The agreement stated predictions of the sentence were neither guarantees nor binding promises and that a sentence greater than anticipated was not grounds for withdrawal of the plea. (*Id.* at 4).

The agreed Statement of Facts for Guilty Plea (ECF No. 17) explained that on June 13, 2012, a Bay County Sheriff's Office investigator, posing as a 13-year-old

girl named "Rhea," responded to a sexually explicit advertisement Defendant posted on Craigslist on June 13, 2012, which included the words "age doesn't matter."    The investigator and Defendant communicated by email, text message, and phone calls over the next few days, and, believing "Rhea" was only 13 years old, Defendant agreed to travel from Pensacola to "Rhea's" house in Panama City on Friday, June 15, 2012, to engage in sexual activity with "Rhea."[1]    Defendant's car broke down near Fort Walton, and he was arrested.

The statement of facts listed the elements of the offense essentially as follows:

1.    Defendant knowingly attempted to persuade, induce, entice, or coerce an individual to engage in sexual activity;

2.    Defendant used a computer and a cellular telephone to do so;

3.    Defendant believed the individual was less than 18 years old;

4.    Defendant could have been charged with a criminal offense under Florida law if the sexual activity had occurred; and

5.    Defendant engaged in conduct which constituted a substantial step toward the commission of the crime.

(ECF No. 17 at 2).

---

[1]   The statement of facts indicates the investigator and Defendant communicated "over the next few days," although initial contact was made on June 13, 2012, and the meeting was planned for Friday June 15, 2012. (ECF No. at 1).   In contrast, the PSR reflects Holley did not begin travel to meet with "Rhea" until June 18, 2012, which was a Monday.   (ECF No. 24, PSR at ¶ 10).

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

The rearraignment proceeding that took place on October 18, 2012, was brief and unremarkable.   (ECF No. 37).   The court advised Defendant of his rights, the charges against him, what the Government had to prove to sustain a conviction, and the mandatory minimum term of imprisonment.   Defendant confirmed he had talked to his lawyer about the Sentencing Guidelines and sentencing statutes and how they might affect his sentence; he also said he had a general idea of the range of sentence he faced.   The court noted Defendant's attorney had "considerable experience" with the Federal Sentencing Guidelines and statutes—an overestimation of counsel's experience, as will be shown later—and that neither counsel nor the U.S. Attorney knew how the court might interpret and apply the guidelines and statutes in Defendant's case.   (*Id.* at 9).

In response to the court's question, Defendant stated he reviewed the plea agreement and supplement carefully with counsel.   (*Id.* at 10-11).   Mr. Burns also assured the court Defendant understood he was facing up to life imprisonment, but at least a ten-year minimum mandatory sentence, and his client fully, freely, voluntarily, and intelligently entered into the plea.   (*Id.* at 13).   The Government, then represented by AUSA Gayle Littleton, gave the same assurances.   (*Id.*)

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

The second final Pre-Sentence Investigation Report ("PSR") calculated Defendant's base offense level as 28 and added a two-level adjustment due to Defendant's use of a computer.   (ECF No. 24, PSR ¶¶ 15, 16).   After a three-level acceptance of responsibility adjustment, Defendant's total offense level was 27. (PSR ¶¶ 22–24).   Defendant had a criminal history category of II, due to two convictions for driving under the influence.   (PSR ¶¶ 30, 32, 33).   The applicable guidelines range of 78 to 97 months based on these calculations became 120 months due to the application of the statutory mandatory minimum.   (PSR ¶¶ 63, 64).

Sentencing was scheduled for January 16, 2013.   The Government was again represented by AUSA Risinger, and Mr. Holley was represented by Mr. Burns.   In addressing the court, defense counsel stated his client conceded to the charges and understood he was facing a ten-year minimum mandatory sentence.   (ECF No. 38 at 3).   Counsel noted the court could choose to sentence Defendant to longer than the ten-year term, but urged the court not to so depart.   (*Id*. at 3–4).   When the court inquired whether Defendant understood there was a mandatory minimum, Defendant responded he had become aware of that only the Saturday before Christmas, December 22, 2012.   (*Id*. at 5).   Defendant later stated he did not know of the minimum mandatory before he entered his guilty plea, attributing this to a

miscommunication between him and his lawyer, or simply his own misunderstanding.   (*Id*. at 7).   Mr. Holley stated he had wanted to put this situation behind him, thinking he would plead guilty and "do that time that was allotted" without having been aware of the minimum mandatory.   Mr. Holley noted he had been told "offenses of this nature are looked down upon" and that trials end up with 25 years to life.   (*Id.* at 7-8).   He explained that after weighing his option of taking the case to trial and doing 25 years to life or pleading guilty and doing 87 months in prison, he chose to plead guilty.   (*Id.* at 8).

The court told Mr. Holley it would consider allowing him to withdraw his guilty plea if he maintained he would not have pled guilty if he had known, or if he were not confused, about the minimum mandatory.   (ECF No. 38 at 7).   Mr. Holley asked the court if there was any chance of a downward departure from the minimum mandatory, and the court informed Mr. Holley it was not authorized to depart absent a certification from the Government that he had provided substantial assistance.   (*Id*. at 8).   Mr. Holley requested the opportunity to take additional time to consider his plea further, and, absent opposition from the Government, the court granted the request.   (*Id*. at 8–11).   The court told Defendant that in light of the information Defendant now had, he needed to decide whether to go to trial, and

it emphasized there needed to be no doubt Defendant had sufficient time to think clearly about his options and talk to his lawyer.   (*Id*. at 11–12).   Mr. Burns spoke up for the record and said it was his understanding he had gone over the issue and his client understood his situation.   (*Id*. at 12).

Sentencing reconvened on February 6, 2013, with Ms. Risinger and Mr. Burns again appearing for the Government and Mr. Holley, respectively.   (ECF No. 36). At that time, the court noted it had reviewed the rearraignment transcript, and observed that Defendant had been clearly advised of the minimum mandatory.   Mr. Burns also reiterated his client's understanding the minimum penalty to which he had pled was ten years.   (ECF No. 36 at 2).   Finally, Mr. Holley himself admitted he had been advised about the applicable mandatory minimum penalty before entering his guilty plea.   (*Id*. at 3).   Defendant stated at that point he had had adequate time to discuss the situation with his attorney, and he thanked the court for ensuring he had the opportunity to be fully informed.   (*Id*. at 4).   The court acknowledged that absent the statutory minimum sentence, Mr. Holley's advisory guidelines range would have been 78 to 97 months imprisonment.   Finding no departure from the mandatory minimum sentence warranted, the court sentenced Mr.

Holley to a term of 120 months imprisonment and a $1,000.00 fine.   (*Id*. at 8).
Mr. Holley did not appeal.

<u>The Habeas Proceeding and Evidentiary Hearing</u>

Mr. Holley timely filed a motion to vacate pursuant to 28 U.S.C. § 2255,
which he amended pursuant to court order, and it is this amended motion, as
supplemented, that is currently before the court.   (ECF Nos. 34, 57).   In his
motion, Defendant claims he is legally and factually innocent of the crime of
conviction; he did not take a "substantial step" towards completion of the crime; his
conviction resulted from investigative misconduct because he was arbitrarily
targeted in the sting operation without probable cause; his conviction resulted from
prosecutorial misconduct; the PSI was flawed; the court erred in accepting his guilty
plea absent a factual basis; counsel was constitutionally ineffective in several
respects; he was entrapped; and 18 U.S.C. § 2422(b) is unconstitutional.

The Government responded, taking the position Mr. Holley's claims are
procedurally barred and without merit.   After conducting a preliminary review of
the record, this court entered a detailed order appointing the Federal Public Defender
to review, in particular, Mr. Holley's claims of legal and factual innocence and
ineffective assistance of counsel.   (ECF No. 49).

Assistant Federal Public Defender Jennifer Hart filed a Supplemental Brief in Support of Petitioner's Amended Motion to Vacate, Set Aside, or Correct Sentence and Request for an Evidentiary Hearing.   (ECF No. 57).   In the brief, counsel noted as follows:

> Investigation has revealed significant deficiencies and inconsistencies in the alleged factual information presented to the Court, errors in the Statement of Facts offered in support of Mr. Holley's guilty plea, errors in the Presentence Investigation Report, false and/or misleading allegations presented to the Court in support of the Government's motion for the pretrial detention of Mr. Holley, as well as significant deficiencies in the representation of Mr. Holley by his trial counsel which include, but are not limited to: the failure to properly advise Mr. Holley regarding the elements of the offense, the failure to investigate possible defenses and interview potential witnesses, the failure to re-open the detention hearing as suggested by the Magistrate Judge, the failure to obtain information concerning a traumatic brain injury suffered by Mr. Holley and the failure to properly advise Mr. Holley of his appellate rights.

(ECF No. 57 at 2-3).   The undersigned finds, for the reasons set forth below, that counsel's representations are, by and large, well taken.

Ms. Hart focused on three grounds for relief in the supplemental brief:   (1) the evidence was insufficient to provide proof of the required elements of the offense and, as such, counsel was constitutionally deficient in advising his client to plead guilty; (2) Mr. Holley had a viable entrapment defense, and counsel was ineffective for failing to explore same; and (3) counsel was ineffective for failing to advise Mr.

Holley with respect to his right to an appeal.   The Government moved for an extension of time to respond, following which AUSA Len Register entered a notice of appearance and filed a response.   (ECF Nos. 61, 62).   In the response, the Government conceded Mr. Holley was entitled to relief on his claim regarding counsel's failure to adequately consult with him regarding his appeal, [2] but maintained the other two claims were without merit.   The undersigned entered an order directing Defendant to respond and setting the matter for oral argument. (ECF Nos. 63, 70).   In the reply, the defense argued the Government's proffered resolution of this matter should be rejected and the court should rule on the merits of Defendant's motion. (ECF No. 68).   It also noted Mr. Holley could show cause for his failure to raise any of the allegedly procedurally barred issues on appeal in light of the Government's concession counsel had been constitutionally ineffective for his failure to consult with Mr. Holley with respect to an appeal.   (ECF No. 68 at 17).

The undersigned heard oral argument on the motion on March 16, 2016, at which time the undersigned indicated his intent to conduct an evidentiary hearing.

---

[2] This position is a total retreat from the position taken in the initial response, which apparently was set forth without any investigation of Mr. Holley's claim.

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

The court directed the parties to file a joint pre-hearing stipulation in anticipation of the hearing, which they did.   (ECF No. 77, 78).

The hearing took place on May 11, 2016, and consumed one day, although Defendant's former attorney, James Burns, was the only witness to testify.   Mr. Burns' testimony, which will be summarized in relevant part below, leaves no doubt to the undersigned that counsel's performance, taken as a whole, was constitutionally deficient.

As the hearing commenced, the Government stated it had confirmed defense counsel had not timely consulted with Mr. Holley with respect to his right to appeal and urged the court to afford Mr. Holley the right to a belated appeal.   (ECF No. 85 at 2-4).   The undersigned noted this remedy had been offered months before and the court had not been convinced then, nor was it convinced now, that a belated appeal would provide a meaningful remedy; the undersigned asked defense counsel to weigh in.   (*Id.* at 4).   Ms. Hart stated this was not the remedy sought.   (*Id.* at 4-6).   The court allowed a recess for Ms. Hart to review Mr. Burns' file.

Mr. Burns testified he was hired to represent Mr. Holley before the case was transferred to federal court, but knew at the time he was hired there would be a federal indictment.   (ECF No. 85 at 10-11).   The retainer contract indicates this

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

federal criminal case number, and counsel had no recollection of making any appearances with Mr. Holley in state court, although the transcript of the detention hearing suggests he did so.   (*Id*. at 11, 41).

Mr. Burns testified he had discussed the sting operation that led to Mr. Holley's arrest, "Operation Riptide," with other criminal defense attorneys in the community.   Mr. Holley's case was not his first in federal court, although Mr. Burns' practice was largely in state court.   When pressed, he said that at the most about 10 to 15 percent of his cases were federal criminal cases, maybe two or three a year.   (*Id*. at 17, 18).   Mr. Burns maintained he is familiar with federal cases, citing as proof the fact he had taken a 50-question test on federal court procedures to become admitted to practice in federal court.   Counsel stated the number of federal cases to which he referred also included appellate practice, but he then admitted he had perfected only a single appeal after a client's guilty plea.   (*Id*. at 21).   Mr. Burns testified he had never taken a federal case to trial, either before or after his representation of Mr. Holley.   (*Id*.).   Counsel's recollection was imprecise as to when he had certain discussions with Mr. Holley, and he was unsure whether he had additional notes that had not been provided.   (*Id*. at 22-32).

Ms. Hart asked Mr. Burns about the detention hearing and the actions he took thereafter.   (ECF No. 85 at 33-46).   Counsel admitted that although he had information regarding the prior charges against Mr. Holley, he did not present this to the court and did not move to reopen the detention hearing.   (*Id*. at 46).   Mr. Burns agreed what happened in 2000 with respect to the prior state charges, or allegations, against Mr. Holley had been important at the detention stage of the proceedings.   (*Id.* at 170).   Counsel nonetheless stated he did not find any additional information after the detention hearing that would have been favorable to his client.   (*Id.* at 170-71).   Mr. Burns recalled having conversations with Mr. Holley's grandmother when he was told the sexual assault allegations were false and the alleged victim was seeking monetary settlement from Mr. Holley, knowing Mr. Holley was expecting a significant accident settlement.   (*Id.* at 172).   Although a state prosecutor seemed to have similar information about the adult accuser's pecuniary interest, Mr. Burns noted this did not alleviate the fact there was a sworn statement alleging some "pretty horrendous things" that would not have been favorable if presented to the court.   (*Id.* at 173).   Another factor in Mr. Burns' decision not to reopen the hearing was his impression Mr. Holley's family would not be able to procure the money to post bond, if one were set.   (*Id*. at 174).   Mr.

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

Burns conceded that, other than speaking with Mr. Holley and his grandmother and reviewing the arrest report from the prior incident, he did no investigation.   (ECF No. 85 at 180).

Ms. Hart questioned Mr. Burns about the discovery he had, and when and how he had reviewed it with his client, and discussed potential defenses.   (ECF No. 85 at 47-58).   Mr. Burns recalled he spoke with Mr. Holley about the language of the Craigslist advertisement, which referenced age as unimportant.   Mr. Burns recalled Mr. Holley said that in order to place such an ad, one had to be 18 years old, and Mr. Holley told him that, despite the Government's interpretation he was seeking minors, he was actually seeking someone older.   (ECF No. 85 at 58, 59).   When Ms. Hart asked what Mr. Burns had done to follow up on Mr. Holley's explanation, counsel stated he "took it into the bank of" Mr. Holley's defense and had the information available but did not see that anything should be done at that point in time.   Counsel made a cryptic comment that if the case had gone to trial, more likely than not he would have filed a motion *in limine* trying to stop "it" from coming in, or limit "it," although it was unclear to what he was referring.   (*Id*. at 59).

Mr. Burns saw no importance in attempting to establish whether Mr. Holley actually did have a preference for older women, stating this information would have

been extraneous in light of the statements made to the undercover officer.   He admitted he did not interview any potential witnesses.   In fact, counsel seemed to indicate he did not investigate this issue because it would have been relevant only if the case went to trial despite the fact that, at that point, Mr. Holley was still trying to make an informed decision as to whether to go to trial.   Mr. Burns appeared to indicate that because his assessment of the Government's discovery suggested the evidence against Mr. Holley was overwhelming, he was not required to do any further investigation, including interviewing potential witnesses.

Ms. Hart asked what Mr. Burns' advice to Mr. Holley would have been, and Mr. Burns said he would have counseled Mr. Holley to plead *nolo contendere*. When reminded that such pleas are not accepted in federal court, Mr. Burns amended his response to indicate he would have advised the client to plead guilty.   Taken as a whole, Mr. Burns' testimony was that, without having done any investigation or interviewed any witnesses, it was his opinion Mr. Holley would have been convicted at trial and therefore it was in his best interest to plead guilty.   (*Id*. at 59-69, 92, 193).

Ms. Hart then questioned Mr. Burns concerning where Mr. Holley was when arrested.   Counsel denied Mr. Holley was going to see his 48-year-old girlfriend in

Panama City.    He stated his "understanding" was Mr. Holley was on the other side

of Navarre, possibly in Fort Walton, although the arrest report revealed Mr. Holley

had his encounter with law enforcement in Gulf Breeze.    (ECF No. 85 at 70-72).

Counsel later conceded this information was inaccurately reported in the Statement

of Facts for Guilty Plea.    (ECF No. 85 at 185-187).

The transcript also very strongly suggests Defendant's former counsel did not

understand the elements of the offense.    (ECF No. 85 at 75).    Mr. Burns explained

the first inquiry under the statute would be whether Mr. Holley was soliciting sex,

which he admittedly was.    After reviewing applicable case law, counsel determined

that whether the individual who made contact with the defendant was an actual minor

or an agent posing as a minor was irrelevant and would not provide a defense.

(ECF No. 85 at 76).    The third relevant issue Mr. Burns identified was whether

there was an "attempt," which, to his mind, was whether the defendant made

substantial efforts and plans to facilitate and bring to fruition the crime he was

planning.    Counsel concluded that, under the totality of the circumstances,

including the contents of the chats, planning the specifics of the visit, and Mr.

Holley's travel towards Panama City, this threshold had been met.

Mr. Burns next testified about his consideration of whether any viable defenses existed. Counsel's consideration of possible defenses, though, was colored by his understanding of the elements of the crime. Counsel explained he considered whether Mr. Holley intended to have sex or not, whether he made substantial efforts to complete the crime, whether he was aware the person was actually underage, whether the defense of entrapment was available, whether or not he could complete the crime, and whether he "knew what he was doing." Mr. Burns indicated a "normal person" would have ceased communication once finding out he was communicating with a 13-year-old, although Burns later also stated a "normal person" would not have been looking for sex on the internet. (ECF No. 85 at 83-91).

Ms. Hart asked Mr. Burns how he reached the conclusion his client could not prevail on an entrapment defense. Burns responded: "Well he placed an ad, and – on Craigslist soliciting sex, and there was no contact – conduct that I was able to see through the reports that seemed to be that the federal government or the state was going beyond their bounds and specifically soliciting or entrapping Mr. Holley; that he had put the ad out there, that he participated in contacting the party when he knew that they were under the age of 13, he continued to solicit, entice, use the means of

interstate commerce, and additionally, he made substantial steps towards the – completing the act; and because he had put that ad out there and all, that he had some kind of predisposition to commit the crime."    (ECF No. 85 at 181).

Counsel's explanation of predisposition was that the client was "soliciting the person . . . that he was aware that they were under 13, that he was having all these discussions concerning sex with a minor," and that the information from discovery showed his client was "actively involved in soliciting the sex with the minor." (ECF No. 85 at 182).    Mr. Burns stated again the jury would have believed a "normal person" would have stopped upon learning the individual with whom he was communicating was 13 years old, but Mr. Holley moved forward.    Mr. Burns indicated he would have raised an entrapment defense had Mr. Holley chosen to go to trial, although he did not think such a defense would have resulted in a not guilty verdict.    (*Id.* at 184).

Next, Ms. Hart asked Burns to explain the "substantial steps" Mr. Holley had taken to commit the charged offense.    Counsel identified putting up the ad, having the conversations with the undercover agent over a period of days, including planning the meeting and discussing specifics about Mr. Holley's car being hidden

in the garage, talk about having sex in the hot tub,[3] and then Mr. Holley's statements to the officer that he was "on his way to get laid."   (ECF No. 85 at 184).   Mr. Burns stated that in light of all this, a "jury could find that you were guilty with – more likely than not, find that you're guilty of the crime."   (ECF No. 85 at 185). Counsel also placed great importance on Mr. Holley's travel towards Panama City, where he believed "Rhea" to be, noting the travel, coupled with everything else, was a substantial step towards the "crime of intent."   (ECF 85 at 185-190).

Mr. Burns' revelation he considered the fact Mr. Holley's car broke down as a possible defense to the charge further calls into question counsel's understanding of the elements of the charged crime, discussed below.   (ECF No. 85 at 191-193). Additionally, counsel noted Mr. Holley "couldn't have had sex with the Navy SEAL," suggesting he believed the sex act itself to be the crime, rather than the enticement.   Mr. Burns did not acknowledge Defendant's ability to actually engage in a sexual act with a minor was not a required element for conviction under the statute.

---

[3] Counsel's mention of a statement regarding having sex in the hot tub was somewhat afield of the actual statement that was made.

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

The testimony adduced at the hearing raises significant question of whether Mr. Burns fully understood various aspects of sentencing in the Northern District of Florida.   Although counsel knew of a minimum mandatory provision and claimed to have repeatedly conveyed that to his client, he dismissed his client's confusion and belief he might be sentenced to less time as "wishful thinking."   He suggested at one point that the plea agreement capped the sentence at ten years, although he receded from that position.   Mr. Burns also did not appear to be personally well-versed in the Sentencing Guidelines, as he had numerous conversations with a probation officer in Panama City and another attorney about the guidelines before discussing the subject with his client.   Further questioning by Ms. Hart revealed Mr. Burns had at best a minimal familiarity with and understanding of basic Sentencing Guidelines issues. (ECF No. 85 at 200-207).   Counsel made erroneous reference to a lack of "statutory mitigating factors" in Mr. Holley's case, which factors he believed might have allowed the court to depart below the statutory minimum mandatory.   Although somewhat hesitantly, Mr. Burns identified "help convict co-defendants, participate with the Government, . . . resolve the case, pay restitution, remorseful, is not sophisticated . . . [and] things of that nature" as factors

that could have allowed the court to depart below the statutory mandatory minimum. (*Id.* at 93-112, 117-137, 152-164).

Counsel also made statements that reflected a lack of understanding of the federal plea process.   For instance, Mr. Burns seemed to be under the impression he had "negotiated" a plea agreement with the Government for a ten-year sentence. Counsel stated "the federal government didn't have to give me a plea agreement of ten years minimum mandatory.   She could have gave me a plea agreement of 15, or she could have gave me one of a little bit higher than that…"   (ECF No. 85 at 164).   The undersigned is well aware the United States Attorney in this district does not negotiate sentences or engage in plea bargaining.   Nor is any specific sentence part of the agreement in this case.

Other areas of concern arose in counsel's testimony.   Mr. Burns failed to apprehend the potential importance of clarifying the information in the PSR as it pertained to the alleged sexual assault in 2000, asserting it would not affect sentencing and was not relevant.   (ECF No. 85 at 207-213).   He was able to answer Ms. Hart's questions about the potential importance of the PSR following sentencing only with great difficulty and prompting.   (*Id.* at 213-215).   When questioned about "parole," Mr. Burns said he "[did not] believe [Mr. Holly was]

eligible on a ten-year minimum mandatory sentence, that he may become – he may become eligible after, like, eight years."   (ECF No. 85 at 215).   Counsel gave no indication he even knew federal parole had long been abolished.

With respect to Mr. Holley's appellate rights, Mr. Burns said he and Holley spoke before sentencing and, at the time, Burns did not know what might be appealable issues in Mr. Holley's case.   Mr. Burns admitted he had no post-sentencing conversations with Mr. Holley concerning an appeal or a post-conviction remedy until months later.   (ECF No. 85 at 218-220).

At the conclusion of Mr. Burns' testimony, the Government declined to cross-examine.   (ECF No. 85 at 220).   The Government also put on no case.

The court directed the parties to file closing memoranda in which they specifically addressed the issue of the appropriate remedy.   The defense argued in its memorandum, as it had previously, that counsel was constitutionally ineffective in advising Mr. Holley to enter a guilty plea where the evidence did not establish proof of each element of the charged offense and in failing to recognize a viable entrapment defense.   (ECF No. 88).   Despite the court's, and Mr. Holley's, repeated rejection of the Government's suggested resolution—that Defendant be

afforded an out-of-time appeal—the Government nevertheless again argued in its response that a belated appeal was the appropriate remedy. (ECF No. 89).

It is with some concern that the court has examined the Government's representations to the court, as well as its written submissions in this case. First, the handling of Mr. Holley's detention hearing and the representations surrounding the incident in 2000 are disquieting. Although no evidence has been introduced, there has been more than a suggestion the alleged incident involved neither a minor nor violence. In any event, the record should have been clarified.

Second, no reasonable dispute appears that Defendant's Craigslist advertisement was posted in an "adults-only" chatroom. Therefore, Defendant's statement therein that "age, relationship status doesn't matter" need not be reasonably construed as evidence of a "predisposition" towards minors. Contrary to the Government's representation, no actual evidence appears that Defendant had any predisposition towards minors and, in fact, the record suggests the opposite. (*See, e.g.,* ECF No. 24-1 at 13-14).

Third, the Government's representation in its initial response that defense counsel was "an experienced criminal defense practitioner" is not helpful, as Mr. Burns' lack of federal court experience shone through in his testimony. (ECF No.

39 at 19).    The Government stated "even employing the benefit of hindsight—one is left asking what effort could counsel have undertaken, that he didn't?    In short, Mr. Burns' conduct in this case was not unreasonable, and any competent attorney would have undertaken Petitioner's representation in a like fashion with a similar outcome."    (ECF No. 39 at 20).    The undersigned recognizes the original use of this rhetorical question may not be attributable directly to the signing AUSA, as the language has appeared in multiple stock responses to 2255 petitions throughout the district.    Nevertheless, in many instances, use of such language for dramatic effect is ill-advised as it undermines the credibility of the individual making the argument. Finally, the court notes the Government's memorandum made no effort to rehabilitate, and, in fact, barely even commented on, the testimony of former defense counsel.

## ANALYSIS

### General Standard of Review

Collateral review is not a substitute for direct appeal, and therefore the grounds for collateral attack on final judgments pursuant to § 2255 are extremely limited.    A prisoner is entitled to relief under section 2255 if the court imposed a sentence that (1) violated the Constitution or laws of the United States, (2) exceeded

its jurisdiction, (3) exceeded the maximum authorized by law, or (4) is otherwise subject to collateral attack.   *See* 28 U.S.C. § 2255(a); *McKay v. United States*, 657 F.3d 1190, 1194 n.8 (11th Cir. 2011).   "Relief under 28 U.S.C. § 2255 'is reserved for transgressions of constitutional rights and for that narrow compass of other injury that could not have been raised in direct appeal and would, if condoned, result in a complete miscarriage of justice.'"   *Lynn v. United States*, 365 F.3d 1225, 1232 (11th Cir. 2004) (citations omitted).   The "fundamental miscarriage of justice" exception recognized in *Murray v. Carrier*, 477 U.S. 478, 496 (1986), provides that it must be shown that the alleged constitutional violation "has probably resulted in the conviction of one who is actually innocent . . . ."

The law is well established that a district court need not reconsider issues raised in a section 2255 motion which have been resolved on direct appeal.   *Rozier v. United States*, 701 F.3d 681, 684 (11th Cir. 2012); *United States v. Nyhuis*, 211 F.3d 1340, 1343 (11th Cir. 2000); *Mills v. United States*, 36 F.3d 1052, 1056 (11th Cir. 1994).   Furthermore, a motion to vacate under section 2255 is not a substitute for direct appeal, and issues which could have been raised on direct appeal are generally not actionable in a section 2255 motion and will be considered procedurally barred.   *Lynn*, 365 F.3d at 1234–35; *Bousley v. United States*, 523

U.S. 614, 621 (1998); *McKay v. United States*, 657 F.3d 1190, 1195 (11th Cir. 2011).

An issue is "'available' on direct appeal when its merits can be reviewed without

further factual development." *Lynn*, 365 F.3d at 1232 n.14 (*quoting Mills*, 36 F.3d

at 1055).   Absent a showing that the ground of error was unavailable on direct

appeal, a court may not consider the ground in a section 2255 motion unless the

defendant establishes (1) cause for not raising the ground on direct appeal, and (2)

actual prejudice resulting from the alleged error -- that is, alternatively, that he is

"actually innocent." *Lynn*, 365 F.3d at 1234; *Bousley*, 523 U.S. at 622 (citations

omitted).   To show cause for procedural default, a defendant must show that "some

objective factor external to the defense prevented [him] or his counsel from raising

his claims on direct appeal and that this factor cannot be fairly attributable to

[defendant's] own conduct." *Lynn*, 365 F.3d at 1235.   A meritorious claim of

ineffective assistance of counsel can constitute cause. *See Nyhuis*, 211 F.3d at

1344.

    In order to prevail on a constitutional claim of ineffective assistance of

counsel, a defendant must demonstrate both that counsel's performance was below

an objective and reasonable professional norm and that he was prejudiced by this

inadequacy. *Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Williams v.*

*Taylor*, 529 U.S. 362, 390 (2000); *Darden v. United States*, 708 F.3d 1225, 1228 (11th Cir. 2013).   *Strickland*'s two-part test also applies to guilty pleas.   *Lafler v. Cooper*, 132 S. Ct. 1376, 1384 (2012) (*citing Hill v. Lockhart*, 474 U.S. 52, 58 (1985)).   A defendant will be required to show that but for counsel's errors, he would not have pleaded guilty and instead would have insisted on proceeding to trial. *Id.* at 1384–85 (*quoting Hill*, 474 U.S. at 59).   In applying *Strickland*, the court may dispose of an ineffective assistance claim if a defendant fails to carry his burden on either of the two prongs.   *Strickland*, 466 U.S. at 697; *Brown v. United States*, 720 F.3d 1316, 1326 (11th Cir. 2013); *Holladay v. Haley*, 209 F.3d 1243, 1248 (11th Cir. 2000) ("[T]he court need not address the performance prong if the defendant cannot meet the prejudice prong, or vice versa.").

Procedural Bar

The government asserts all of Defendant's substantive claims are procedurally barred due to his failure to raise them on appeal or as a result of his admissions at the plea colloquy.   As noted above, a defendant may overcome a procedural bar by showing both cause for not raising a ground for relief earlier and prejudice.   *Lynn*, 365 F.3d at 1234; *Bousley*, 523 U.S. at 622.   A meritorious claim of ineffective assistance of counsel can constitute cause.   As conceded by the Government, Mr.

Burns failed to consult with Mr. Holley after sentencing regarding an appeal.   As found by this court herein, Mr. Holley was deprived of constitutionally effective representation before entering his plea. Therefore, with respect to any claims that should have been raised earlier, Mr. Holley has overcome the procedural bar.

<u>Ground One−Legal and Factual Innocence</u>

Defendant first argued in his *pro se* motion to vacate that he is legally and factually innocent of violating 18 U.S.C. § 2422(b).   This argument is somewhat subsumed into the ineffective assistance of counsel claim in that Defendant claims counsel was constitutionally ineffective for advising the guilty plea.   With reference to the pertinent statute, Defendant urges he did not attempt to persuade, induce, entice or coerce anyone.

Title 18 U.S.C. § 2422(b) states in relevant part:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, ... knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, *or attempts to do so, shall be fined [and imprisoned]*.

18 U.S.C. § 2422(b) (emphasis added).   To sustain a conviction for the crime of attempt, the government must prove (1) Defendant had the specific intent to engage in the criminal conduct with which he is charged and (2) he took a substantial step

toward commission of the offense.   *United States v. Murrell*, 368 F.3d 1283, 1286 (11th Cir. 2004) (*citing United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1369 (11th Cir. 1994)).   The *Murrell* court emphasized the underlying criminal conduct proscribed by § 2422(b) is the persuasion, inducement, enticement, or coercion of the minor rather than the sex act itself.   *Murrell*, 368 F.3d at 1286.   Therefore, as later restated in *United States v. Lee*, 603 F.3d 904 (11th Cir. 2010), the Government must prove the defendant "intended to cause assent on the part of the minor, not that he 'acted with the specific intent to engage in sexual activity.'"   *Lee*, 603 F.3d at 914 (*citing United States v. Yost*, 479 F.3d 815, 819–20 (11th Cir. 2007); *United States v. Pierson*, 544 F.3d 933, 939 (8th Cir. 2008); *United States v. Dwinells*, 508 F.3d 63, 71–72 (1st Cir. 2007); *United States v. Thomas*, 410 F.3d 1235, 1244 (10th Cir. 2005); *United States v. Bailey*, 228 F.3d 637, 639 (6th Cir. 2000)).   As to the prohibited conduct, the Government must prove the defendant took a substantial step toward causing assent, but not toward causing actual sexual contact, because the statute criminalizes an intentional attempt to achieve a mental state–a minor's assent. *Lee*, 603 F.3d at 914 (citations and internal quotations omitted).

     In accordance with the above-cited authority, and with reference to the conduct alleged in this case, to sustain a violation of 18 U.S.C. § 2422(b) the

Government must demonstrate five elements beyond a reasonable doubt.   These

are: (1) defendant knowingly attempted to persuade, induce, entice, or coerce an

individual to engage in sexual activity; (2) defendant used a computer and a cellular

telephone to do so; (3) defendant believed the individual he attempted to persuade,

induce, or entice was less than 18 years old; (4) defendant could have been charged

with a criminal offense under Florida law if the sexual activity had occurred; and (5)

defendant engaged in conduct which constituted a substantial step toward the

commission of the crime.   (ECF No. 17, Statement of Facts for Guilty Plea at 2).

The factual basis for the plea provided as follows:

On June 13, 2012, a BCSO investigator, posing as a 13 year old girl, responded to a sexually explicit advertisement posted on Craigslist by the Defendant Brennon Kyle Holley.   Attached to the advertisement were four pictures: two pictures of Holley's face and two pictures of a naked male with an erect penis (face not shown).   The investigator and Holley communicated by email, text message, and phone calls over the next few days.   During these conversations, the investigator identified himself to Holley as a 13 year old girl named "Rhea."   Despite "Rhea's" age, Holley engaged in sexually explicit conversations with "Rhea," attempting to entice and persuade her into engaging in sexual activity.   Holley then agreed to travel to "Rhea's" house in Panama City on Friday night, June 15, 2012, when he got off work in order to engage in sexual activity with "Rhea."

(ECF No. 17 at 1).

Before Defendant filed this motion, there was no evidence of record providing specific support for the factual basis.    The document itself recited only conclusory statements as to the inducement, enticement, and persuasion elements.    The documentation Defendant submitted with his reply provides greater context for the snippets of dialog set forth in the PSR.    This documentation makes a colorable case for Defendant's position that although he may be guilty of other law violations, the factual basis for the plea in this case is deficient.    Mr. Holley states in his reply he posted a sexually explicit ad on Craigslist, in a chat room that was intended for persons over the age of 18.    According to Mr. Holley, users must confirm they are 18 before entering into this chat room, and the Government has offered no evidence to rebut this.    (ECF No. 41 at 5–6, 14).    Defendant's ad, a copy of which is appended to the motion, stated "age, relaonship (sic) status doesn't matter" and included two photos of Defendant and two shots of an adult male's erect penis.    (*Id.* at 14).    Defendant explains the intent of the ad was to lure "older women" and, in light of the fact he placed his ad on an adult-oriented website, it never occurred to him to specify he was not "attempting to prey on children."    (*Id.* at 6).

Defendant attached portions of conversational threads between him and the fictitional "Rhea,"[4] who, says Defendant, contacted him first about the ad.   (*Id.* at 15–16).   Apparent from the viewable text is that after a suggestive comment by Defendant, "Rhea" said (for the first time) "im 13 but I really want to have some fun 2nite.   If thats cool let me know so I can call u," to which Defendant immediately responded "as much as I would like to, I cznt go to jail, babe."   (*Id*. at 16).

Defendant also included another string of what appear to be text messages, although some of the text is truncated.   (ECF No. 41 at 17–18).   In these exchanges, Defendant asked "Rhea" if she was really 13 and whether she knew he was 33.   (*Id*. at 17).   "Rhea" responded she did not know his age but "it is cool" with her and "I just want to try something new and im sick of these stupid boys." (*Id.*).   Defendant responded she could get him jail time, and "Rhea" said "u really think I want 2 b in trouble.   If my parents found out I was even talkn to u I would be [text omitted]."   (*Id.*).   She then asked Defendant if he would want to come over and chill with her, to which he replied "I dunno, kinda sketchy.   I've seen those t.v. shows."   She asked whether he was referring to Girls Gone Wild, and

---

[4]   "Rhea" was actually Investigator Albert Willis of the BCSO.   There is no record evidence as to who supplied the voice of "Rhea."

Defendant explained he meant about "dudes comin over to see these chics;" the remainder of the text is deleted.    "Rhea" said she had never seen those but was not one of them and if "u don't feel comfortable with comin 2 c me I [text omitted]." She also stated if Defendant did not want to come over that was cool, but she "just wanted to chill with a guy that is not stupid."    After they discussed how "Rhea" found his ad and saw his pictures, "Rhea" commented it was "too bad u don't want to hang :(."   Defendant responded he "might come by and chill for a min, watch a movie r [text deleted]."    "Rhea" replied "that's cool but 2 be honest thats kind of boring."    Defendant responded "we'll see where it goes from when I arrive."   (*Id.* at 17).

Defendant and "Rhea" then discussed Defendant's Craigslist pictures, and "Rhea" said she had "never seen one that big ;)."   (ECF No. 41 at 19).    Defendant quipped that the camera always adds 10 pounds or 10 inches, and "Rhea" then asked "is urs really that big?   Yummy lol!"    Defendant responded "Girl I would hurt your ass lol," and "Rhea" said "it always hurts at first but u get used to it :) there would be only one way to find out lol."    Defendant then said "don't tempt me," to which "Rhea" replied "I can only tempt u if ur here. ;)"    Then came an apparent pause in the text conversation when the two spoke on the phone, after which Defendant texted

he loved "Rhea's" voice and she responded she "really [was] excited to c u Friday" and was going to sleep but would be thinking of Defendant and his pictures.   (*Id.* at 19).

The following day, "Rhea" texted Defendant and said she had been thinking a lot about the following night, and she asked Defendant "what do u want to do?" (ECF No. 41 at 20).   He said "Guess we'll just have to see!"   She then asked him "well what ur fav thing 2 do? cuz I want us 2 have fun." (*Id.*).   Defendant did not immediately respond, apparently because he was working.   After some additional conversation, "Rhea" asked "u still want 2 come over tomoro?" to which Defendant responded "of course!"   (*Id.* at 21).   "Rhea" asked "what do u want 2 do tomoro? Im getting excited ;)."   Defendant responded "whatever you would like!   Look forward to meeting you!"   "Rhea" asked again what was Defendant's favorite thing to do, and he said "Lots of things!   Drink play pool swim play guitar. Chill watch movies.   All kinds of stuff!"   When he asked "Rhea" the same question, she said "idk, I guess I wanted 2 do something I normally wouldn't get to do since im home alone :)."   (*Id.* at 22).

"Rhea" asked Defendant to send more pictures, and he refused.   He expressed concern about getting in trouble, and "Rhea" said she was deleting all his

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

texts because she could not get in trouble.   (*Id*.).   Defendant asked "Rhea" to promise she would not hook up with someone else online because there were "some sick people out there that do some sick shit."   He said he was glad she hit him up instead of someone else because he was easy going and not some "sick perv!"   (*Id*.).

Defendant told "Rhea" he was not looking for a girlfriend and he could be her friend until the end and a shoulder to cry on, but he was not "doing relationships." (*Id*. at 23).   "Rhea" said that was fine because they couldn't have anything long-term due to her age and she "just want[ed] to feel good tomoro nite."   Defendant asked if "Rhea" wanted him to stay the night, and she said it would be awesome. When he expressed concern again about law enforcement waiting on him when he arrived, she said "omg I would never do something like that 2 u, if u get in troble I do 2 :(."   When the conversation turned more sexually explicit, "Rhea" responded by saying Defendant's comments were "so hot" and she "wanted it 2 b good 4 u" and maybe Defendant could "teach [her] some ways to be better at" certain things when he was there.   (*Id*. at 23–24).   When Defendant made a suggestive comment, "Rhea" responded "ur so bad! I cant wait to c u!!," and she later told Defendant she just wanted to make him feel good no matter what.   (*Id*. at 25).

Defendant continued to express concern about going to jail.   He asked "Rhea" for a picture, clarifying he wanted "Nothing x rated just a face pic."   (ECF No. 41 at 26).   Then, he asked whether their conversation was "law related," meaning no law enforcement was involved in any of the conversations.   "Rhea" denied this, saying "omg no! I hope u know how much troble I would be in.   I deleted all of our texts this morning, plz don't tell anyone about this."   (*Id*.).

The evening Defendant was supposed to go to "Rhea's" house, there were apparently numerous calls between the two.   "Rhea" texted Defendant that she thought Defendant was just playing games with her and said she waited for him all day.   (ECF No. 41 at 27).   Defendant apparently explained his car had broken down, and "Rhea" asked Defendant twice if he would come over the next day because that was the last day she had the house to herself.   (*Id*. at 27–28).

The contents of the telephone calls between "Rhea" and Defendant Holley are not part of the record.   The limited transcripts of the other communications between Defendant and the fictitious "Rhea" evidence a willingness, if not also an intent, on Defendant's part to engage in unlawful conduct.   Nevertheless, such comments are decidedly less persuasive if one is actually looking for proof of the statutory requisite

that Defendant intended to cause assent on the part of the minor rather than the other way around.   *See Lee*, 603 F.3d at 914, 916.

As the court noted in its May 2015 order, the records Mr. Holley produced suggested he may have a viable claim counsel was constitutionally ineffective for advising or allowing him to plead guilty.   The court also noted alternatively, or additionally, that Mr. Holley might be able to establish counsel was constitutionally ineffective for failing to test the Government's case by challenging the sufficiency of the evidence or failing to challenge the factual basis for Defendant's guilty plea on appeal.   *See United States v. Ternus*, 598 F.3d 1251, 1254–55 (11th Cir. 2010); *United States v. Frye*, 402 F.3d 1128–29 (11th Cir. 2005).

Based on the testimony adduced at the evidentiary hearing as set forth above, the undersigned has no difficulty concluding Mr. Holley has established the representation he received during these proceedings did not rise to the minimal constitutional standard required by *Strickland*.   Mr. Holley did not have the benefit of an attorney who conducted even minimal investigation to assist in making a decision whether to plead guilty or proceed to trial.   He did not have an attorney who investigated the 2000 incident and endeavored to obtain release on conditions so as to allow more direct contact between lawyer and client.   Nor did he have an

attorney who understood the elements of the charged offense, the applicable law, the operation of the Sentencing Guidelines, and important nuances of federal practice in this court.   Counsel also neglected his duty to consult with his client about appellate rights despite the entry of a guilty plea.

In order to establish a violation of *Strickland*, Mr. Holley must, of course, show prejudice as well as deficient performance.   Here, Mr. Holley was deprived of the critical opportunity to make a meaningful and informed decision whether to go to trial and likely the opportunity to be released pending trial.   The record is clear Mr. Holley struggled with his decision to enter a guilty plea.   The context of the charge is important.   The undersigned finds it hard to conjure something more debasing, humiliating, and stressful than an accusation that an individual attempted to coerce or entice a minor to have sex.   In these cases, the tension is palpable, making it even more important to assure a factual basis as to the elements of the charge exists.   Counsel simply did not honor his obligation of conducting a full and fair investigation and providing meaningful advice ahead of the plea.

## REMEDY

The parties were directed to brief the appropriate remedy.   Defendant initially argued his conviction should be vacated and he should be released from

custody.   He argued in the alternative the court should permit him to withdraw his plea, vacate the conviction, and grant him a new trial should the Government choose to proceed.   In the reply memorandum, Mr. Holley urges that the court not only vacate his conviction but also acquit him of the charged offense.   The case is not in the appropriate posture and the record is inadequately developed for the latter remedy.   The undersigned therefore recommends Mr. Holley be permitted to withdraw the guilty plea and be afforded a detention hearing under the Bail Reform Act to present his case for release on bond subject to the Government's right to timely proceed on the charges against him.   *See* 18 U.S.C. § 3161(i).

Accordingly, it is respectfully **RECOMMENDED**:

Mr. Holley's amended motion to vacate, set aside or correct sentence, as supplemented (ECF No. 34, 57), be **GRANTED** to the extent Defendant be permitted to withdraw his guilty plea, the conviction be vacated, and Defendant be afforded the opportunity to move for release on bond subject to the Government's right to pursue its case against him.

Case Nos.: 5:12cr25/MW/CJK; 5:14cv34/MW/CJK

DONE AND ORDERED this 24th day of August, 2016.


/s/ *Charles J. Kahn, Jr.*
**CHARLES J. KAHN, JR.**
**UNITED STATES MAGISTRATE JUDGE**



## NOTICE TO THE PARTIES

Objections to these proposed findings and recommendations may be filed within fourteen (14) days after being served a copy thereof.  **Any different deadline that may appear on the electronic docket is for the court's internal use only, and does not control.**  A copy of objections shall be served upon the magistrate judge and all other parties.   A party failing to object to a magistrate judge's findings or recommendations contained in a report and recommendation in accordance with the provisions of 28 U.S.C. § 636(b)(1) waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions.  *See* U.S. Ct. of App. 11th Cir. Rule 3-1; 28 U.S.C. § 636.