# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### GAINESVILLE DIVISION

UNITED STATES OF AMERICA,

v.                                          CASE NO. 5:12-cr-25-MW/CJK
                                            CASE NO. 5:14-cv-34-MW/CJK

BRENNON KYLE HOLLEY,

　　　　*Defendant.*

_____/

## O R D E R

This matter is before the Court on the Report and Recommendation of the Magistrate Judge, ECF No. 91, to which the United States filed objections, ECF No. 92.  Mr. Holley filed a response to the objections.  ECF No. 95.  For the reasons that follow, this Court rejects the Report and Recommendation of the Magistrate Judge and denies Mr. Holley's Amended Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody, ECF No. 34, as supplemented by ECF No. 57.

## I.

As described more fully below, the resolution of this case is fact intensive and neither side has consistently provided an accurate or complete

version of the actual events.  Accordingly, an exhaustive presentation of the interactions at the heart of this case is below.

## A. **The Interaction Between Holley And "Rhea"**

Law enforcement interest in Mr. Holley in this case began as part of Operation Riptide, conducted from June 13, 2012, to June 17, 2012.  On those dates, the Bay County Florida Sheriff's Office "along with other member agencies of the North Florida Internet Crimes Against Children Task Force conducted an undercover operation, entitled 'Operation Riptide' using the internet in an attempt to curb the ongoing problem of sexual exploitation of children by way of the internet." ECF No. 24, Second Final Presentence Investigation Report at ¶ 5.  An investigator associated with the operation noticed the following advertisement placed by Mr. Holley on Craigslist.com:[1]

---

[1] The black rectangle in the right of the picture of Mr. Holley's face redacts two pictures of his face and two of his erect penis.



ECF No. 41, at 14–15.

In particular, the agent noticed the statement underlined in the picture above that "age, relationship status doesn't matter." ECF No. 24, at ¶ 6. Using the Craigslist.com messaging system, the agent contacted Mr. Holley at 9:46 p.m. on Wednesday, June 13, 2012, using the name "Rhea Hartley." The Craigslist.com messages were as follows:[2]

> RHEA: r u still there?[3]
>
> HOLLEY: yeah babe what's up?

---

[2] All of the messages appear in ECF No. 41, at 15–16, and ECF No. 57, at 5–6.

[3] This Court uses the original spelling and capitalization of the communications between the agent and Mr. Holley.

Case No: 5:12-cr-00025-MW/CJK

Case No. 5:14-cv-00034-MW/CJK

The agent immediately began trying to convince Mr. Holley that he was

dealing with a minor:

> RHEA: not much, my parents left me in the house for
> a few days and since I cant drive yet im bored as hell
> :(

Despite being told that Rhea lives with her parents and "cant drive yet", Mr.

Holley asked if she would like to get together:

> HOLLEY: want some company babe?
>
> RHEA: that sounds like fun! what would u want to
> do?
>
> HOLLEY: baby I want to do everything you desire!
> text or call @[phone number redacted]

The agent then doubled down on making sure that Mr. Holley understood

that the person he thought he was dealing with was a minor.  At 10:32 p.m.,

the agent sent this message via the Craigslist.com messaging system:

> RHEA: sounds good.  im 13 but i really want to have
> some fun 2nite, if that's cool let me know so i can call
> u ;)

Note that the agent left the next step up to Mr. Holley.  "Rhea" asked

Mr. Holley to "let [her] know" so that she could call him.  Mr. Holley

responded four minutes later (at 10:36 p.m.) with the following response:

> HOLLEY: as much as I would like to, i cznt go to jail babe

Although Mr. Holley declined her offer of having "some fun 2nite", he indicated that he "would like to" and that he declined because he feared going to jail for having sex with a 13-year-old.

The agent, as Rhea, did not respond.

Eighteen minutes passed, during which Mr. Holley apparently had a change of heart.   At 10:54 p.m., he sends this message:

> HOLLEY: call me

Seven more minutes passed without "Rhea" responding.  Mr. Holley sent another message:

> HOLLEY: you there

Three minutes after that, the agent responded as Rhea:

> RHEA: im here, excited u messaged me back, about
> to call u ;)

Four more minutes passed, and Mr. Holley appeared to be getting impatient, posting the following:

> HOLLEY: waiting

Twelve more minutes passed, and Rhea posts the following at 11:20 p.m.:

> RHEA: i just texted u, did you get it?

Mr. Holley did not appear to respond, and fifty-eight minutes later, at 12:18

a.m., Rhea texted Mr. Holley:[4]

> RHEA: hey its Rhea! sorry it took awhile to text u but i was on the phone with my gf
>
> HOLLEY: All good babe :) where you live?

*Id.* at 1. Three minutes passed with no response and Mr. Holley texts "Hello?"

Rhea responded three more minutes later with the following:

> RHEA: sorry, just got a new cell and trying to get used to it. i live in lynn haven, florida. its close to panama city

*Id.* Mr. Holley then—sua sponte—raised the age issue again:

> HOLLEY: Okay and you're really 13, You kno i'm 33 right?
>
> RHEA: i didn't know that but its cool wit me, i just want to try something new and im sick of these stupid boys around here.
>
> HOLLEY: Honey you could get me jail time
>
> RHEA: lol! u really think i want 2 b in trouble. if my parents found out i was even talkn to u i would be so grounded
>
> HOLLEY: Lol

*Id.* Rhea then asked Mr. Holley where he lived and he responded that he lives

in Pensacola.  She then stated that she's been there a couple of times, and

then the agent—as Rhea—further reiterated that she is thirteen:

---

[4] All of the texts appear in ECF No. 57 attach. A.

> RHEA: i hope u dont care im 13 cuz i just want to
> have fun like everyone else :)
>
> HOLLEY: All good hon

*Id.* Rhea then asked Mr. Holley if he wanted to come over, and Mr. Holley

responds that he worried this could be a sting operation:

> RHEA: would u want to come over and chill wit me
> sometime, my parents are gone till sunday
>
> HOLLEY: I dunno kinda sketchy.  I've seen those t.v.
> shows.
>
> RHEA: what tv shows? In panama city?
>
> RHEA: u aren't talkn bout those girls gone wild
> movies r u? ive never been in one of those lol!
>
> HOLLEY: Na bout dudes coming over to see these
> chics and bein set up and shit.

*Id.* at 1–2. The agent, as Rhea, denied having seen those and gave Mr. Holley

a gracious and easy way to decline to visit her:

> RHEA: oh, ive never seen those, well im not one of
> them but if u dont feel comfortable with comin 2 c me
> i respect that you got ur reasons :(
>
> HOLLEY: And why would you want me over? :)
>
> RHEA:  idk, i figured since u wanted to know where I
> live u wanted to come over, but if u don't thats cool I
> guess
>
> RHEA: i just wanted to chill with a guy that is not
> stupid when it comes to girls to hang with

*Id.* at 2. Mr. Holley then quizzed Rhea on where she found him, and she

indicated that her friend told her about the advertisements and she liked his

pictures.  She also complimented him on his youthful appearance, and he thanked her.  The agent then gave Mr. Holley another chance to walk away:

> RHEA: its too bad u dont want to hang :(

*Id.* A cat-and-mouse game between Mr. Holley and the agent playing Rhea ensued, where Mr. Holley wanted to communicate that he was interested in sex without saying anything specific and damning while the agent wanted to get Mr. Holley to make the sexual nature of his intentions explicit without the agent himself being the first to speak explicitly:

> HOLLEY: I might come by an chill for a min, watch a movie r something
>
> RHEA: thats cool but 2 b honest thats kind of boring, I really liked ur pics ;)

*Id.* Mr. Holley did not distance himself from the sexual implication of Rhea's statement, but he tried to stay safe:

> HOLLEY: We'll see where it goes when i arrive.

*Id.* He then immediately steered the conversation in a sexual direction in the next text:

> HOLLEY: How many guys have you been with
>
> RHEA: my ex bf was my first and only, how many girls u been with?
>
> HOLLEY: Baby i honestly couldn't tell you.  Dunno.

*Id.* If Mr. Holley was trying to entice her with his experience with women, he would have thought that it succeeded.  After Rhea stated that she is not surprised by this because he looks good, she then stated that it actually was a good thing that he was experienced:

> RHEA: thats cool wit me cuz im tired of boys that dont know what to do

*Id.* Mr. Holley then asked her if she was black or white, and she answered that her mom was white and her dad was black.[5]  *Id.* at 3.  Rhea then asked Mr. Holley if the pictures in the Craigslist.com ad were really him.  *Id.* The following sexually explicit conversation then took place:

> RHEA: just askin lol! ive just never seen one that big ;)
>
> HOLLEY: Camera always adds 10 lbs … or 10 in! Lol
>
> RHEA: is urs really that big? Yummy lol!
>
> HOLLEY: Girl i would hurt your ass! Lol
>
> RHEA: haha! it always hurts at first but u get used to it :) there would be only one way to find out lol!
>
> HOLLEY: Don't tempt me! ;-)
>
> RHEA: hehe! I can only tempt u if ur here ;) do u want me to call u?
>
> HOLLEY: Yes

---

[5] Note that Mr. Holley's Craigslist.com ad sought "brown skinned girls needing some company."

*Id.* Rhea then called Mr. Holley and the following conversation took place:

(the transcript of the following phone conversation is found at ECF No. 57

attach. B):[6]

> HOLLEY:  You've got such tiny voice you are so cute
>
> RHEA: I'm sorry what? Wait I can't hear you
>
> HOLLEY: I said you've got such a tiny voice, you are so cute
>
> RHEA: Well thank you
>
> HOLLEY: Mmm. Wow damn.
>
> RHEA: Well I can let you go to sleep
>
> HOLLEY: Ugh oh my gosh I love your voice.

*Id.* Note that Mr. Holley was enraptured by her voice because it was "tiny"

and "cute", typical aspects of a little girl's voice.  Mr. Holley then

spontaneously told her that he wanted to visit her:

> HOLLEY: I said I'd sure like to come and visit you
> sometime.
>
> RHEA: Oh really, I hope so
>
> HOLLEY: Yeah, definitely, most definitely

*Id.* Mr. Holley and Rhea then conversed about Pensacola and its beaches for a

few moments before Mr. Holley turned the discussion back to sex.

---

[6] In the Report and Recommendation, the Magistrate Judge stated that "The
contents of the telephone calls between 'Rhea' and Defendant Holley are not part of the
record." ECF No. 91, at 40.  This statement is incorrect.  At the time the Report and
Recommendation was written, the transcripts of the telephone calls were available as
attachments B through G to the Federal Public Defender's supplement to the amended §
2255 motion at ECF No. 57.

> HOLLEY: So your last boyfriend was 20 years old huh.
>
> RHEA: Yeah he was 20
>
> HOLLEY: Yeah I've got about 13 years on him
>
> RHEA: Well that's ok with me.

*Id.* at 3. Mr. Holley then revealed he was conflicted—not with the moral turpitude of having sexually explicit conversations with a person he believed to be a thirteen-year-old girl—but with the possibility that this was a sting operation:

> HOLLEY: Rrrrr
>
> RHEA: Is that ok with you?
>
> HOLLEY: It (inaudible)
>
> RHEA: What
>
> HOLLEY: I'm just going to have to meet you and hang out and stuff because I mean you seem -- have you seen those fucking TV shows like you know, you've got like the sick pedophile dudes that are like online and you know they are looking for like young little people and shit and then they like get busted and shit like that. You know what I'm talking about?

*Id.* Note that Mr. Holley attempted to distance himself in Rhea's eyes from "sick pedophile dudes" looking for "young little people" despite the fact that he was talking to a thirteen-year-old girl about the size of his penis, his and her sexual experience, how cute she is, all while setting up a meeting at her house with her parents gone.

Rhea then continued to deny she had heard of such shows and asked

what channel it was on.  Mr. Holley responded as follows:

> HOLLEY: Hell I don't know babe. I have no idea. But
> you know that's why I'm so sketchy I mean hell you
> sound cool your cool as shit over the phone and what
> not you know I mean but I don't want to go to jail.

*Id.* 3–4. Again, his chief concern was going to jail for his actions with Rhea

once they met, not the harm he would cause a thirteen-year-old girl.  Rhea

reassured him that she would not get him in trouble:

> RHEA: Well I won't get you in trouble. Are you going
> to get me in trouble?
>
> HOLLEY: Hell no.
>
> RHEA: Well I won't get you in trouble

*Id.* at 4. Mr. Holley then returned to the prospect of him coming by "just to

hang out" but then implied that sexual conduct will follow if he felt

comfortable:

> HOLLEY: Mmm ok. Well I'll hang out with ya to see
> what's up and figure things out you know what I'm
> saying (laughs)

*Id.* That is, once he saw "what's up" and "figure[d] things out" (that is,

determined she wasn't an agent) they could carry out the plan both had been

hinting at.

> RHEA: Right

*Id.* The two then began to plan exactly when he would come visit her.  Mr.
Holley stated that he got off work anywhere from 2:00 p.m. to 4:00 p.m. on
Friday.  After some confusion, they agreed that Mr. Holley would come by
Friday at around 6 p.m.  *Id.* at 4–5.  Mr. Holley again stated that he was
merely dropping by to "say hey" (and not do anything sexual), but reiterated
that he wants to learn "what's up you know":

> HOLLEY: I'll stop by and say hey what's up and meet
> ya and all that then I'm going to go and see another
> friend of mine that lives in Fort Walton Beach I was
> going to go and see them and go and say what's up so
> I can defiantly like swing by and see what's up you
> know.

*Id.* at 5. Immediately after the call, Mr. Holley texted Rhea, and the following
exchange took place from 2:08 a.m. until 2:09 a.m.:

> HOLLEY: Omg i love your voice!
>
> RHEA: lol! thanks. i really am excited to c u Friday,
> can i text u tomorrow?
>
> HOLLEY: Text or call whenever you want :)

ECF No. 57 attach. A, at 3.

The next morning Mr. Holley texted Rhea at 10:41 a.m. but Rhea did
not respond.  *Id.* Four hours later, at 2:05 p.m., he texted a "?" to Rhea.  *Id.* at
3–4. Three hours after that, at 5:53 p.m., with no response from Rhea, he
texted "What's up!"  *Id.* at 4. She responded eight minutes later, explaining

that she was at the beach without her phone.  *Id.* Mr. Holley then turned

back to setting up the visit:

> HOLLEY: All good! Gonna try to leave around 4 or 5
> 2maro

*Id.* They don't text again for four more hours.

At 10:41 p.m., the two began texting again.  *Id.* After some non-sexual

talk, the agent playing Rhea tried again to get Mr. Holley to explicitly state

his desires, but he sidestepped the attempt while still leaving the possibility

of sexual activity:

> RHEA: ive been thinkn a lot about tomoro nite ;)
> what do u want to do?
>
> HOLLEY: Guess we'll have to see! ;-)

*Id.* At 10:55 p.m., the agent kept trying to get Mr. Holley to state what he

wanted to do:

> RHEA: well what ur fav thing 2 do? cuz I want us 2
>
> have fun ;)

*Id.* Mr. Holley did not respond until after midnight, explaining that he was

finishing work.  He then talked about enjoying his workplace and that he was

going to have a beer and a few shots of vodka before crashing.  As becomes

important later, Rhea asks about vodka:

> RHEA: what does vodka taste like?

> RHEA: ive tried beer b4 but never vodka
>
> HOLLEY: Probably not something you you would like hon lol it's good mixed but you wouldn't like it straight

*Id.* at 5. The cat-and-mouse game continued as Rhea turned the conversation back to the planned meeting and tried to get Mr. Holley to say something explicit, but Mr. Holley continued to play it carefully:

> RHEA:  k, u still want 2 come over tomoro?
>
> HOLLEY: Of course!
>
> RHEA: what do u want 2 do tomoro? im getting excited ;)
>
> HOLLEY: Whatever you would like! Look forward to meeting you!
>
> RHEA: well what ur fav thing 2 do?
>
> HOLLEY: Lots of things! Drink play pool swim play guitar. Chill watch movies. All kinds of stuff!
>
> HOLLEY: What about you hon?
>
> HOLLEY: Guess you fell asleep
>
> RHEA: idk i guess i wanted to 2 do something i normally wouldnt get to do since im home alone :)

*Id.* at 5–6. In response to this obviously sexual reference, Mr. Holley did not explicitly disavow any sexual intentions.  Instead, he again tried to make sure that she was not an agent before he said anything:

> HOLLEY: We'll see how things go ;-) would like to do something diff too! Want to meet you and go from there.  You liked the pics huh?

> RHEA: Yeah, do u have n e more you could send me?
>
> HOLLEY: Just have ta wait! Lol noone knos i'm coming right?
>
> RHEA: no! ur not going to 2 get me in troble r u?
>
> HOLLEY: Honey That's what I'm so scared of is getting in trouble.  for me its jailtime! I so hope you're cool! I really want to come over and hang out.  You're deleting all of these texts right?

*Id.* at 6. The agent playing Rhea reassured him that she was but then changed tack, explaining that she kept asking what he wanted to do because she's afraid of being hurt:

> RHEA: yeah cuz i cant get n troble, i hope ur cool too. i guess thats why i keep askn what u want 2 do, do u want 2 hurt me
>
> RHEA: dont want u 2 hurt me

*Id.* Mr. Holley promises that he would never hurt her:

> HOLLEY: Omg honey HELL NO! I've never hurt a girl in any way in my life. You're just fine with me angel :)
>
> HOLLEY: Rhea i promise on everything i would never do that. Only way I've ever hurt a girl is breakin their heart. That's why i'm single and plan to stay that way babe! :-)
>
> RHEA: ool, i know i havnt met u but i trust that u wouldnt hurt me :)

*Id.* Mr. Holley appeared to completely buy into her statement, and again attempted to distance himself in her eyes from other dangerous people she could meet online:

> HOLLEY: Aww thank you babygirl. Just please please please promise me that you won't hook up with someone else online. You're young and there are some sick people out there that do some sick shit! I'm actually kind of glad you hit me up instead of someone else. I'm really easy goin and NOT some sick perv!

> RHEA: it makes me really happy 2 hear that ;) i just got hurt and dont want that ever again

> HOLLEY: I'm sorry honey. Just please kno that i'm not looking for a girlfriend. I'll be your friend till the end and a shoulder to cry on but i'm not doin relationships @ the moment

> RHEA: That's cool with me, i dont think we could b anything longterm bcuz of my age, just want to feel good tomoro nite :)

> HOLLEY: Yum! ;-)

> RHEA: r u cool with this being just a one nite thing?

> HOLLEY: Yeah why just one nite tho? If you don't mind me asking

> RHEA: dk, i just thought one nite bcuz my parents will be back sunday :( i guess we just have 2 get creative to make it more ;)

> HOLLEY: I LOVE the way you think! Want me to stay the nite with you or no?

> RHEA: that would be awesome!!! i would luv it!

*Id.* at 6–7. The agent playing Rhea then mentioned that the house has a hot tub and Mr. Holley, after threatening to have her beaten if a SWAT team is there, suddenly became explicit about his desires:

> RHEA: my house has a pool and hot tub ;)
>
> HOLLEY: I swear to god if the cops are waitin on me to get there, i'm gonna find some girl to kick your ass! LMAO! :)
>
> RHEA: lol! omg i would never do something like that 2 u, if u get in trouble i do 2 :(
>
> HOLLEY: Naked, you sitting in my lap, kissing me in the hottub would be nice angel :-)
>
> RHEA: omg thats so hot!
>
> RHEA: have u ever done it in a hot tub b4?
>
> HOLLEY: Yeah, it's not as good as you would think. I'm afraid I may hurt your fresh lil pussy with my cock if we fuck babe :(
>
> RHEA: i know u would b careful, i want it 2 b good 4 u :)

*Id.* at 7. Mr. Holley then attempted to entice her by promising that he wanted "it" to be super good for her as well.  He then asked about a specific sex act:

> HOLLEY:  No i want it to be super good for you! You like to suck too?
>
> RHEA: i do if its u ;) i hope u will like it, but im afraid im not that good at it, i just havent done that a lot
>
> RHEA: maybe u could teach me some ways to b better at it :)

> HOLLEY:  I'll teach you. :) please please please
> delete all of our messages and promise this is OUR
> secret! I so don't wanna go to jail for liking someone!

*Id.* at 7–8.  After each of them promised they would tell no one about the

intended meeting, Mr. Holley quickly turned the discussion back to sex:

> HOLLEY: What's our bra size hon?
>
> RHEA: 32 a, is that ok

*Id.* at 8. Mr. Holley then asks her to send him pictures of herself, stating that

it was unfair that she "got to see ALL" of him.  Rhea declined, stating that

her phone did not have a camera.  He then asked about her body:

> HOLLEY: Tell my your height, weight,
> measurements and what physical attribute you like
> best about yourself honey
>
> RHEA: lol ok! im like 5 3 and i think the last time i
> was wayed i was 100 pounds. i really like my legs
> from playing soccer alot :)

*Id.* Mr. Holley then turned to what she would wear when he came over and

commented on his plan to take it off:

> HOLLEY: Nice! What are you gonna be wearing
> when i come over? :-)
>
> RHEA: idk, is there something u want me 2 wear 4 u?
> i could wear my new bathing suit :)
>
> HOLLEY: That would be great angel! I bet it looks
> better in tha floor! ;-)
>
> RHEA: haha! ur so bad! i cant wait to c u!!!

> HOLLEY: Me either! if this is some real shit, i've been wantin it for a long long time
>
> HOLLEY: Lowe they sound of your voice
>
> RHEA: i loved hearing u 2, i kno u will take good care of me, i just want 2 make u feel good no matter what :)
>
> RHEA: i can't wait to be in the hot tub with u!!!

*Id.*[7]

Mr. Holley then asked her to "Call me and tell me goodnight angel." It was after 3 a.m.[8]  *Id.* They conversed on the telephone about his job serving tables, and then he spontaneously mentioned how much he loves her voice and then her laugh and how it makes him feel safe that there will not be a SWAT team waiting for him at her house:

> HOLLEY: I love it when you laugh man that speaks even better shit (laughs) so a swat team is not going to be waiting in the driveway whenever I pull up tomorrow right?
>
> RHEA: What'd you say? You broke up.
>
> HOLLEY: I said the swat team isn't going to be waiting in the driveway whenever I pull up tomorrow right?
>
> RHEA: What's a swat team

---

[7] It should be noted that on pages eight and nine of the supplemental memorandum in support of the § 2255 petition, ECF No. 57, counsel for Mr. Holley purports to give a complete description of the texts described above.  Mr. Holley simply did not mention much of the sexual discussion set out above and, particularly, failed to mention anything about the naked kissing in the hot tub or Mr. Holley's question about whether she liked to suck and his promise that he'd teach her how to do it better.

[8] The transcript of this call is found at ECF No. 57 attach. C.

> HOLLEY: The cops damn, the fucking cops.
>
> RHEA: Oh no babe why would I do that? I don't want to get you in trouble and do you know how much trouble I could get in?
>
> HOLLEY: I don't want you to get in any trouble
>
> RHEA: I don't want to get you in any trouble either.

*Id.* at 2. Mr. Holley then asks about a garage so that he can hide his car while he is there:

> HOLLEY: Awesome baby, awesome, thank you, thank you. Is there a garage I can pull into?

*Id.*

After she assured him there is a garage, he reiterated that he cannot wait to see her and that "We'll have fun right there at the house." *Id.* Rhea then asked him what the plan is, and he responded as follows:

> HOLLEY: The plan is (mumbles) can I climb all over you?
>
> RHEA: You're going to climb all over me?
>
> HOLLEY (after Rhea has trouble hearing him): I said I'm going to place you in my lap and kiss you.

*Id.* at 3.

After this, they both stated that they were excited and nervous about the planned meeting, and Mr. Holley again stated that he was nervous about being arrested because of this "age thing" that "automatically, automatically spells jail time." *Id.* at 4. After Rhea promised she did not want to get him in

trouble, she asked him if he wanted to get her in trouble. *Id.* He responded

by repeating his plan of hiding his car overnight in the garage:

> HOLLEY: No I promise. I promise I won't. That's why
> I asked if you have a garage or if yall have a garage
> so I could like park in the garage until 7 or 8 in the
> morning which I have to work Saturday morning.

*Id.* They then made plans for him to leave early Saturday morning even

though he might be sleepy if "we stay up all night." *Id.* at 5. Mr. Holley then

told her what she should be wearing when he arrived and what he planned to

do:

> HOLLEY: Answer the door in your bathing suit
>
> RHEA: I thought you just wanted me to leave it
> unlocked or just come in I thought you just wanted
> me to be in the hot tub
>
> HOLLEY: Mmm I'd love for you to be in the hot tub
> but I want you to answer the door for me you gotta
> let me in that garage too.
>
> RHEA: Right
>
> HOLLEY: Right, so open the garage door let me pull
> in, answer the door in your bathing suit and then we
> will hit the hot tub.
>
> RHEA: Yeah that sounds great.
>
> HOLLEY: Does it?
>
> RHEA: Mmm hmm.
>
> HOLLEY: Kick ass man, kick ass. Damn Rhea I can't
> wait for tomorrow

*Id.* at 6. After they hung up, Mr. Holley texted her goodnight, repeating again how much he loves her voice.  ECF No. 57 attach. A, at 9. The last text that night was at 3:34 a.m., early Friday morning.  *Id.*

No texts or calls occurred until 5:45 p.m. that evening, Friday, June 15, 2012.  *Id.* Rhea initiated contact and asked if Mr. Holley was coming that night.  *Id.* Mr. Holley mentioned his fear that this was a sting, but then agreed to "ride out" to her house:

> RHEA: thought bout u all night ;) r u still coming?
>
> HOLLEY: I am but i'm still soo scared! Honey i really can't go to jail and lose everything
>
> RHEA: i said i wuldnt get u n troble and u said u wuldnt get me in troble but ur kind of scaring me :(
>
> RHEA: i really want 2 c u but i dont want to be scared, do u think we shuld c each other?[9]

*Id.* Mr. Holley again pointed to his age and experience in an attempt to entice or persuade her to follow through with the plan, while still worrying about a police sting:

> HOLLEY: By sayin that to me babe, i fell as tho you're not fake or tryin to set me up. So yeah i'm gonna ride out. Honesty is key in this situation. I kno that i ALWAYS hung out with 20-30 yr olds @ your age. They were so much cooler! Lol i guess i'll be much more comfortable when i get there and the cops

---

[9] ECF No. 57, Exhibit B, wrongly lists this comment as coming from Holley but the context and the records attached to ECF No. 41 as Exhibit A show that this text was indeed an SMS OUT, meaning that the agent posing as Rhea sent it.

*Case No: 5:12-cr-00025-MW/CJK*
*Case No. 5:14-cv-00034-MW/CJK*

don't show up! Lol want to c you badly! And no face
pic? For real? Nothing x rated just a face pic babe

RHEA: im really sorry baby I want 2 send u pics but i
cant, my parents took their laptop with them that
has the camera :(

RHEA: i really appresiate u being honest wit me 2,
all the boys ive known have always lied 2 me, i trust
u :)

RHEA: u can take pics of me when u get here, as long
as u promise not 2 show them 2 n e body lol!

HOLLEY: And this is not law related?

RHEA: what do u mean?

HOLLEY: I mean there is no law enforcement that
has been involved in any of our conversations?

RHEA: omg no! i hope u kno how much troble i would
b in. i deleted all of our texts this morning, plz dont
tell anyone about this!

HOLLEY: Awesome

*Id.* Mr. Holley then told her he was going to nap for a while. *Id.* at 10.

Later that evening, at 9:27 p.m., he texted her that he was awake. *Id.* He

tried to call her but she didn't answer.[10] *Id.* He then texted "Hello?", and she

responded that she will call him when she was off the phone with her mother.

*Id.* She called him at 9:57 p.m., *id.*, and he asked her where her house is in

---

[10] ECF No. 57, Exhibit B, wrongly lists this attempted call as CALL OUT, which
signifies that the agent placed the call. The context of the next text, Holley saying "Hello?"
and the records attached to ECF No. 41 as Exhibit A show that this call was indeed a CALL
IN, meaning that Holley placed it.

relation to Panama City.[11]  She told him and then, out of the blue, he again

threatened her:

> HOLLEY: Well hey well if the swat team is waiting
> on me whenever I get there I'm going to kick your ass

*Id.* at 1. After she promised that she would not be calling the SWAT team, he

laughed, celebrated by saying "kick ass", and then stated that it would take

about an hour or hour and a half for him to get there.  *Id.* at 2. She asked if

he would be able to text and call while driving and he responded that she

better call him; he didn't want to text and drive.  *Id.* He then randomly asked

if she has orange juice:

> HOLLEY: Do you have orange juice?
>
> RHEA: I'm sorry what?
>
> HOLLEY: Do you have orange juice?
>
> RHEA: Yeah we have orange juice.  Why?
>
> HOLLEY: For the vodka

*Id.* He celebrated again by saying "Alright kick ass.  Kick ass baby."  He then

promised to get on the road and call her when he got close.

He left Pensacola shortly after that,[12] and called her while crossing the

bridge from Pensacola to Gulf Breeze.  The call went to voicemail, ECF No. 57

---

[11] The transcript of this call is at ECF No. 57 attach. E.

[12] The Second Final PSR, ECF No. 24, at ¶ 10, incorrectly states that Holley began travelling to meet "Rhea" on June 18, 2012.  The Statement of Facts, ECF No. 17, and the

attach. F, and she called him back.[13]   When Rhea complained that she

thought he was not coming, he explained that he was:

> HOLLEY: Oh baby you should know better than that
> I mean I want to see you so bad.
>
> RHEA: Like when you said.
>
> HOLLEY: In the hot tub man. What?
>
> RHEA: I know I'm excited.
>
> HOLLEY: Are you?
>
> RHEA: Mmm hmm.
>
> HOLLEY: I like excited. Excited is good. Shit, hell ya
> man if I could, if I can finally get to meet you and
> hang out and shit, chill in the hot tub fucking
> chilling.

*Id.* at 2. He then asked about the new bathing suit he told her to be wearing

when he got there:

> HOLLEY: Good deal, good deal. Shit. So you got the
> new bathing suit on man?

*Id.*

He then went back to being scared of a police sting, asking if he was

"totally incognito" or whether she told anyone.  *Id.* at 3. When she said she

hadn't and then asked him if he had told anyone, he responded that he only

---

transcripts of the calls and texts reveal that Holley traveled to meet "Rhea" on Friday, June 15, 2012.

[13] The transcript of this call is at ECF No. 57 attach. G.

feared getting caught—he did not have moral reservations about having sex with her:

> HOLLEY: Fuck no. shit it's really fucked up you know I mean like ok if the roles were switched you know what I'm saying you were a dude which I was and at your age man I'm fucking, hell I was hanging out with fucking 20 and 30 year olds all day everyday man because they were a lot cooler than the little fucking minions that I was going to school with and shit. I mean fucking a dude I don't want to hang out with fucking school cats I want to fucking, I want to party. You know…
>
> RHEA: Right I mean that's why you know my ex he was 20 because I didn't like the guys.
>
> HOLLEY: Right, right so you know it's like it's just really kind of fucked up man you know what I mean this situation and the age difference and shit it's like it's looked down upon if we hang out if we fucking have a good time you know. It's really fucked up man, but whatever, whatever. Like I said as long as it's between me and you and it's all good and I'll hang out with you.
>
> RHEA: Right.
>
> HOLLEY: I would love seeing you that's why I'm driving

*Id.* Mr. Holley later asked if her neighbors would be watching her yard for strange vehicles pulling up.  *Id.* at 5. She promised that the neighbors "were really, really old and they go to sleep really early."  *Id.* He responded, "Cool, cool, cool…so is like our title cover a secret right?"  *Id.* Rhea promised it was.

Mr. Holley then asked Rhea why she got the idea to look on internet dating sites and again attempted to distance himself in her eyes from the "weirdos", "psychopaths" and "serial killers" (as he described them) on the internet. *Id.* at 5–6.  He warned her never to go to such sites again, stating:

> HOLLEY: Yeah it is really fucking scary man and that's why I'm so thankful that you fucking got with me instead of some other, somebody else because somebody else might have been some crazy mother fucker or some shit.

*Id.* at 6. After that, Mr. Holley directed her not to tell even her best friends about him:

> HOLLEY: Alright, cool, I do not exist to your besties or anybody, I do not exist

*Id.* at 7.

A short time later, Mr. Holley's car broke down in Gulf Breeze, Florida, with all but one of his lug nuts falling off the driver's front tire.  ECF No. 57 attach. H, at 1. Gulf Breeze is located about five miles from downtown Pensacola, across the bridge, and on the way to Lynn Haven, Florida.  As will become important later, Gulf Breeze is approximately thirty-three miles west of Fort Walton and eighty-seven miles west of Lynn Haven / Panama City.

Upon breaking down, Mr. Holley immediately called Rhea, upset about not being able to make it.  *Id.* He told the agent playing Rhea that he was at

the Royal Palace Buffet and Hibachi on Highway 98. *Id.* When Rhea asked

whether he was "just not wanting to come", he denied it strenuously:

> HOLLEY: Oh my God hell no Rhea hell no I'll take a
> picture of my shit I've got it up on a jack right now in
> a parking lot, I'll take a picture of it and send it to
> you because I was totally on my fucking way. I want
> to get up there so bad shit.

*Id.* Eventually, Mr. Holley's sister called, and Mr. Holley and Rhea hung up.

*Id.* at 2. Mr. Holley then texted Rhea and the following exchange took place:

> HOLLEY: Now my feelings are hurt. I didn't do this
> on purpose baby.
>
> RHEA: its ok baby do u think you could come over
> tomorrow???
>
> HOLLEY: As soon as i get my car fixed i will be
> RIGHT THERE babygirl!

ECF No. 57 attach. A, at 11.

### B. <u>The Arrest of Mr. Holley</u>

In the meantime, the agent playing Rhea contacted the Santa Rosa

County Sheriff's Office to have a deputy drive by the restaurant at which Mr.

Holley stated he was stranded, to verify he was actually there. ECF No. 57

attach. L, Offense Report from Santa Rosa County Sheriff's Office. The

deputy did so and "started to have a casual conversation with him." *Id.* Mr.

Holley told the deputy that his lug nuts had broken off the driver's side front

tire. *Id.* When asked where he was going that night, Mr. Holley stated he

was going to Fort Walton (notably, not Lynn Haven or Panama City) to "get a

piece of ass." *Id.* The officer left without arresting Mr. Holley or apparently informing him that he was under investigation. *Id.* [14]

On Monday, June 18, 2012, Mr. Holley was arrested by the Escambia County Sheriff's Office based on an arrest warrant issued in Bay County. He was transferred to Bay County and eventually given bond on June 26, 2012. On August 22, 2012, Mr. Holley was indicted by federal authorities. On September 5, 2012, he received a detention hearing before Magistrate Judge Bodiford, where his counsel, Mr. Burns, requested that he be released on bond. ECF Nos. 11–12.

## C.  The Detention Hearing

During the detention hearing, in support of its argument for detention without bond, the government stated to the Court that Mr. Holley had been arrested previously on similar charges:

> [T]he government has at least one arrest memorandum, or report of some sort, which basically details that he met a girl on the internet -- in that particular case, met a girl on the internet; they talked for a few months; they went out; and then he forced her to have sex with him at, I believe,

---

[14] As noted above, the Second Final PSR incorrectly states that Holley began travelling to meet "Rhea" on June 18, 2012, when it was really Friday, June 15, 2012. Additionally, Paragraph 10 of the PSR also wrongly implies that the deputy who made contact with Holley the night he travelled and broke down took him into custody at that time. The records of Holley's Bay County case, DKT #2012-CF-1999, contains an "Arrest Packet" docketed July 17, 2012, showing that Holley was arrested on Monday, June 18, 2012, by Escambia County deputies on a warrant out of Bay County.

*Case No: 5:12-cr-00025-MW/CJK*

*Case No. 5:14-cv-00034-MW/CJK*

> knifepoint. Again, I don't want to mislead the Court.
> We do not know what happened to those charges. I
> don't know if he was arrested and then they were
> later dismissed, or what have you. But we do have at
> least one prior allegation of an incident involving
> sexual activity with a minor.

ECF No. 57 attach. M, at 5–6.  These statements by the government are

wrong in two ways.  First, the complaint affidavit, ECF No. 57 attach. O, does

not state that a knife was involved.  Instead, the complaint averred that he

held her hands down and forced her to have intercourse.  The arrest warrant

also did not mention a knife:

> On Sunday, March 11, 2001, at approx. 11:00p.m.,
> defendant Brennon Kyle Holley did intentionally and
> forcefully commit sexual battery upon victim [name
> redacted by the undersigned], by overpowering her in
> his car, while on a date, and he demanded sexual
> intercourse with her. This was a first meeting and a
> first date, and the act was committed without her
> consent and without provocation. Victim asked
> defendant to stop his sexually aggressive behavior
> and she attempted to push him away, but he
> physically held her down to commit said felony. This
> offense having occurred in Walton County, FL in
> violation of FS 794.011

ECF No. 57 attach. N, at 2.

Second, neither the victim's affidavit nor the arrest warrant indicated

that the victim was a minor.  The Florida Statute cited in the arrest warrant

does not either; its subsections cover sexual battery of both minors and

adults.  However, it should be noted that Walton County online records

describe the case as involving a victim under age twelve, as shown by this
screenshot from October 24, 2016:



The "Statute Text" entry states that the victim was "< 12 YOA" meaning less
than twelve, and the statutory provision was cited as "794.011.2a." Section
(2)(a) of § 794.011 deals with a victim who is less than twelve. Nevertheless,
this Court concludes from the complaint affidavit and the arrest report that
the victim was not under twelve. Indeed, Mr. Holley claims that the Walton
County records indicate that the alleged victim in 2001 was 19. ECF No. 57,
at 16.

At the detention hearing, Mr. Burns challenged the government's
version of the prior arrest, indicating that he had seen the arrest report or
warrant and that no knife was involved.[15] ECF No. 57 attach. M, at 7. He
also told the Magistrate Judge that the charge had been nolle prossed. *Id.* at

---

[15] He did not mention the allegation that a minor was involved.

7, 14.  Using the report to support detention without bond, he argued, would

therefore be unfair to Mr. Holley, especially since the government could not

produce documentation of what the actual allegations were.  *Id.* at 7–8.

Finally, he also argued that the government could have easily gotten the

report for the Court to review, as "the report was in the courtroom less than

ten blocks from here" two months earlier. *Id.* at 13.

Mr. Burns also provided many arguments in favor of Mr. Holley's

release: he had never fled when previously on bond; he had never been

convicted of a violent crime; he could be electronically monitored; he had not

had any trouble while on state bond; he had steady employment at two

possible locations; he did not have a passport; he did not have the assets or

vehicle to flee; and he lived with his sister at his grandmother's house where

no young children are ever present.  *Id.* at 2–4, 7–9.  He also wrongly argued

that Mr. Holley had turned himself in to both state and federal authorities.

He did not; he was actually picked up by authorities each time.  *Id.* at 4–5.

The Magistrate Judge and government then noted, without citing the

statute expressly, that 18 U.S.C. § 3412 created a presumption in Mr.

Holley's case that detention was necessary.  *Id.* at 14.  Section 3412(e)(3)(E)

provides:

> (3) Subject to rebuttal by the person, it shall be
> presumed that no condition or combination of
> conditions will reasonably assure the appearance of

> the person as required and the safety of the
> community if the judicial officer finds that there is
> probable cause to believe that the person
> committed—
>
> > (E) an offense involving a minor victim under
> > section … 2422 … of this title.

Since Mr. Holley was charged under 18 U.S.C. § 2422, his case triggered this

rebuttable presumption and the Magistrate Judge indicated that it would

detain Holley:

> THE COURT: Mr. Burns, I'm going to enter an order
> of detention based upon the allegations in today's
> indictment. However, if you can find something that
> will point to whatever happened in 2000[16], or if you
> come up with anything new, feel free to file a motion
> for rehearing, and we will reopen these proceedings.

*Id.*

Noting the Magistrate Judge's concern about the underlying facts of the

2001 arrest, the government attempted to make sure that the Magistrate

Judge was detaining Mr. Holley based only upon the facts of the instant

offense:

> MS. RISINGER: So just to be clear for the record,
> Your Honor, you're detaining him today based on the
> allegations in this case and the punishment he is
> facing in this case without consideration to what may
> or may not have occurred in 2000?

---

[16] The prior conduct and arrest occurred in March of 2001, but the parties often
incorrectly refer to the incident as occurring in 2000.

*Case No: 5:12-cr-00025-MW/CJK*
*Case No. 5:14-cv-00034-MW/CJK*

> THE COURT: At this point in time what happened in 2000 may be important to me. I don't know.
>
> MS. RISINGER: Okay.
>
> THE COURT: But the allegations, as we have them here today, is the ten years to life, the age of the alleged -- who he thought was the victim, his ties to the community, this community. That's what I'm basing it on.
>
> MS. RISINGER: Thank you, Your Honor.
>
> THE COURT: But I'm not saying that what happened in 2000 will not change my mind.

ECF No. 57 attach. M, at 14–15. The Magistrate Judge ordered that Mr. Holley be detained without bond. Counsel for Mr. Holley did not return to the Court with the actual documents from the 2001 arrest or attempt to reopen the detention proceedings.

### D. <u>The Guilty Plea</u>

Over the course of the next few months, Mr. Burns met with Mr. Holley on several Saturdays to discuss the evidence against him, the elements of the offense, the government's case against him, any potential defenses (including entrapment), and the potential penalties faced by Mr. Holley. ECF No. 85, at 49–51. Eventually, Mr. Holley plead guilty on October 18, 2012. ECF No. 18, transcript at ECF No. 37.

The Statement of Facts, ECF No. 17, contained three statements that Mr. Holley claims are inaccurate:

> However, the Statement of Facts was not accurate.
> Mr. Holley and Investigator Willis communicated
> with each other for a period of about 48 hours, not
> over a period of "a few days." Mr. Holley did not
> engage in sexually explicit conversations with "Rhea"
> to entice her to engage in "sexual activity." It was
> Investigator Willis who struggled to get Mr. Holley to
> mention anything that had to do with anything other
> than simply hanging out, playing pool, or watching a
> movie. In addition, Mr. Holley's car broke down in
> Gulf Breeze, not in Fort Walton. Mr. Holley's counsel
> should not have allowed Mr. Holley to sign this
> Statement of Facts.

ECF No. 57, at 19.  The Statement of Facts also said that an encounter

between Mr. Holley and Rhea would have violated a Florida statute that

defines "sexual activity" as "the oral, anal, or vaginal penetration by, or union

with, the sexual organ of another or the anal or vaginal penetration of

another by any other object." § 800.04(1)(a), Fla. Stat (2016). Mr. Holley

claims that this element was not explained to him during his plea colloquy,

and the evidence would not have supported a prosecution under this theory.

This Court disagrees with every assertion Mr. Holley made concerning

the Statement of Facts.  First, communications began before midnight on

Wednesday, June 13th, and ended early Saturday, June 16th.  That

constitutes at least "a few days."  Second, as shown at length above, the texts

and phone calls with Rhea were replete with sexually explicit conversations

about penis size, intercourse in hot tubs, oral sex, kissing while naked in a

hot tub, the size of her breasts, whether he would hurt her if they had sex, how many lovers she had previously, etc.  Third, as described more fully below, sufficient evidence existed that Mr. Holley enticed the person he thought was a minor to commit illegal sexual acts by telling her of his experience, his desire to make it good for her, his promise that he would not hurt her, and his sincerity in actually wanting to be with her.  Fourth, to say that Mr. Holley did not "mention anything that had to do with anything other than simply hanging out, playing pool, or watching a movie" is incomplete, misleading, and unfair.  Mr. Holley appears to consciously ignore his repeated statements that "we will see what happens when I get there," (followed by winking emoticons) which clearly intimate a desire for sexual activity while trying to avoid saying too much.

Fifth, while it is true that his car broke down in Gulf Breeze, which is thirty-three miles further west than Fort Walton, this does little to help Mr. Holley's case.  Gulf Breeze is five miles on the way from his home in Pensacola to Lynn Haven, where Mr. Holley thought Rhea lived.  Also, Mr. Holley called her minutes before the breakdown discussing that he was coming to see her and telling her what to wear, how to answer the door, and how eager he was to jump in the hot tub with her immediately upon arrival.  Moreover, as soon as his car broke down, he called Rhea to promise that his

car really was broken-down—not that he did was abandoning her.  Thus, the fact that the Statement of Facts misstated how close he was to Lynn Haven when his car broke down would make little difference in the decision whether to plead or not.

Finally, a reasonable jury could conclude from Mr. Holley's promise that he would teach her how "to suck" that he was intending to persuade or entice her to let him orally penetrate her with his penis, which would violate the statute listed in the Statement of Facts.  Therefore, nothing in the Statement of Facts would make reasonable counsel in Mr. Burns's position to advise his client not to sign it.

## E. <u>The Presentence Report</u>

Probation eventually prepared a Second Final Presentence Investigation Report.  ECF No. 24.  Mr. Holley argues that the Presentence Report also contains several errors: (1) that Mr. Holley had been detained by state on these charges since his arrest on June 18, 2102, when he had actually bonded out on the state charges; (2) that Mr. Holley traveled to see Rhea on Monday June 18, 2012, and was arrested the same day, when in reality he traveled on Friday, June 15, 2012, and was arrested the following Monday, June 18, 2012; (3) that counsel should have objected to the criminal history points for convictions listed in ¶¶ 30 and 32 because it was unclear

whether he was represented by counsel for them; and (4) that ¶ 36 of the PSR—dealing with the 2001 arrest—wrongly indicated that attorney representation was unknown, failed to indicate that it was dropped, and wrongly stated that no court record in Walton County existed.

This Court concludes that none of these errors prejudiced Mr. Holley. First, whether he had been detained did not affect the sentence in any way. Second, the days on which he traveled and was arrested did not affect the sentence in any way. Third, even if the two criminal history points should not have been included, Mr. Holley's Guidelines range was determined by the statutory mandatory minimum under Guidelines § 5G1.1(b). Thus, any error in determining the criminal history would be harmless. Finally, ¶ 36 stated that the charge was "dropped / abandoned" and, since Mr. Holley received the lowest possible sentence under the statutory mandatory minimum, nothing in the record shows that any errors in this paragraph had any effect on his sentence.

### F. The First Attempt at Sentencing

On January 16, 2013, Mr. Holley appeared before the Court for sentencing. ECF No. 26, transcript at ECF No. 38. At sentencing, the following colloquy took place between Mr. Holley and Judge Smoak:

THE DEFENDANT: I was not aware, given the guidelines, I'm sure it was a miscommunication between my lawyer and I, or simply my misunderstanding. I did not know of minimum mandatory looking at the points that I scored out to before, before October 18th when I pled guilty to this offense. I just -- I really wanted to put this behind me, and I pled and thought that I would do that time that was allotted. I wasn't aware of the minimum mandatory. Now that I am aware of it, once again, I would like to get this behind me.

THE DEFENDANT: At the same time, Your Honor, I was told offenses of this nature are looked down upon understandably, quite understandably, and trials usually end up with 25 years to life. That's basically the option I was given, or the option I weighed, was do I want to take this to trial and possibly do 25 years to life, or do I plead guilty and do 87 months in prison? Actually, I pled.

THE COURT: Well, do you now, knowing what you know now, feel that you need to reconsider whether it was in your best interest to plead guilty?

THE DEFENDANT: Your Honor, is there any chance of a downward departure from this minimum mandatory?

THE COURT: That's what I'm not authorized to do unless there is a specified ground that has not been -- appeared in this case.

THE DEFENDANT: Right.

THE COURT: The law is that I have to apply a mandatory minimum, unless -- and the main way is if the Government had certified to me that you had provided substantial assistance in the prosecution of other people.

> THE DEFENDANT: I'm at a loss, Your Honor. I'm
> not sure if you recall, I had a very, very difficult time
> standing here before you on October 18th and
> pleading out to this offense. I don't suppose there's
> any chance that I would be given that opportunity to
> consider this further?

ECF No. 38, at 7–8.  The Court then asked the prosecutor her position and

discussed his and counsel's schedules.  He then set the matter for

resentencing, stating the following:

> THE COURT: Give you that opportunity to consider
> that and talk with your lawyer. Because I want to be
> -- not to be any doubt that you've had full time to
> think clearly about your options in this case and that
> you don't have any misunderstanding. You
> understand that?

*Id.* at 11–12.  Mr. Holley stated that he did understand, and the matter was

set for a follow-up hearing to be held three weeks later.

## G. <u>The Second Sentencing Hearing</u>

On February 6, 2013, the parties met again for sentencing.  ECF No.

28, transcript at ECF No. 36.  The following colloquy took place:

> THE COURT: And were you -- do you admit that you
> were advised prior to your change of plea that you
> were facing a term of mandatory -- minimum term of
> imprisonment of ten years?
>
> THE DEFENDANT: Yes, Your Honor.

> THE COURT: And you – you've had adequate time to discuss all of this with your lawyer, both the ramifications of having pled guilty and the possible sentence?
>
> THE DEFENDANT: Yes, Your Honor.
>
> THE COURT: Do you have any questions remaining at this time?
>
> THE DEFENDANT: I have no questions, Your Honor. I would like -- I would like to thank you for giving me this opportunity to make sure that I was completely informed. Whether or not -- whether or not I was or wasn't, I feel as though I've always known the difference between right and wrong, Your Honor, and I did wrong. And I've – I've put on myself tremendous shame and much disappointment from my family and embarrassment. And I'm prepared for the sentence that you give me.

ECF No. 36, at 3–4.  The Court then calculated his Guidelines range to be seventy-eight to ninety-seven months in prison, which became 120 months because of the mandatory minimum. *Id.* at 7.  The Court concluded the sentencing by stating as follows:

> THE COURT: Mr. Holley, you are advised that you have the right to appeal your sentence. If you are unable to afford the cost of an appeal, you may apply for leave to appeal informa pauperis. Any notice of appeal must be filed within 14 days of today. And if you request, the court clerk will immediately file a notice of appeal on your behalf.

Mr. Holley did not appeal.

## H. Postconviction Procedural Posture

Almost a year later, Mr. Holley filed a Motion to Vacate under 28 U.S.C. § 2255 on February 6, 2014.  ECF No. 31.  Pursuant to the order of the Court, he filed an amended § 2255 motion.  ECF No. 34.  Eventually, the Magistrate Judge ordered Mr. Holley to file a pleading setting out with particularity his claim that counsel never advised him of his right to an appeal.  ECF No. 43.  Mr. Holley filed a Supplement, ECF No. 47, to which he attached his affidavit and the affidavit of his sister, his grandmother, and a family friend named Lonnie Burdette.

The Magistrate Judge appointed the Federal Public Defender to represent Mr. Holley and to file a supplemental § 2255 motion. ECF No. 49.  Mr. Holley then filed his Supplemental Motion to Vacate under 28 U.S.C. § 2255.  ECF No. 57.  After being ordered to do so, the government filed a response.  ECF No. 62.

In the response, the government disputed each of Mr. Holley's claims except the claim that counsel never consulted with him regarding his right to appeal the judgment against him.  As to that claim, the government conceded that counsel failed in his duty to consult with the defendant about his right to appeal the judgment as required by *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000), and recommended that the Court: (1) vacate the criminal judgment from which the out-of-time appeal is to be permitted; (2) the same sentence should then be reimposed; (3) upon reimposition of that sentence, the

defendant should be advised of all the rights associated with an appeal from any criminal sentence; and (4) the defendant should also be advised that, pursuant to Rule 4(b)(1)(A)(i), he has ten days to file a notice of appeal from that re-imposed sentence. *Id.* at 4 (citing *United States v. Phillips*, 225 F.3d 1198, 1201 (11th Cir. 2000)).

The Court ordered Mr. Holley to file a reply, and he did so. ECF No. 75. The Court then set the matter for an evidentiary hearing, ECF No. 77, and it was conducted on May 11, 2016. ECF No. 84, transcript at ECF No. 85. The parties then filed closing memoranda. ECF Nos. 88–90. The Court entered a Report and Recommendation, ECF No. 91, recommending that "Mr. Holley's amended motion to vacate, set aside or correct sentence, as supplemented (ECF No. 34, 57), be GRANTED to the extent Defendant be permitted to withdraw his guilty plea, the conviction be vacated, and Defendant be afforded the opportunity to move for release on bond subject to the Governments right to pursue its case against him." The government objected, ECF No. 93, and Mr. Holley responded to that objection. ECF No. 95.

## II.

In the motion, ECF No. 57, the Federal Public Defender described the investigation that she conducted and summarized the grounds for relief that the investigation revealed:

This investigation has revealed significant deficiencies and inconsistencies in the alleged factual information presented to the Court, errors in the Statement of Facts offered in support of Mr. Holley's guilty plea, errors in the Presentence Investigation Report, false and/or misleading allegations presented to the Court in support of the Government's motion for the pretrial detention of Mr. Holley, as well as significant deficiencies in the representation of Mr. Holley by his trial counsel which include, but are not limited to: the failure to properly advise Mr. Holley regarding the elements of the offense, the failure to investigate possible defenses and interview potential witnesses, the failure to re-open the detention hearing as suggested by the Magistrate Judge, the failure to obtain information concerning a traumatic brain injury suffered by Mr. Holley, and the failure to properly advise Mr. Holley of his appellate rights. In short, Mr. Holley asserts that the cumulative effect of these errors resulted in the conviction of a defendant who was deprived of his constitutional right to the effective assistance of counsel, and resulted in the conviction of someone who is actually innocent of the charged offense. Accordingly, his *Motion* should be granted and his conviction and sentence vacated.

ECF No. 57, at 2–3.

As to the factual errors in the Statement of Facts and the Second Final Presentence Report, this Court in sections I.D. and I.E. explained above why none of Mr. Holley's arguments regarding these have any merit.  *Supra* pp. 34–38.  Additionally, Mr. Holley did not present any further argument in ECF No. 57 or any later document regarding a "traumatic brain injury." Therefore, that argument is deemed waived.  Accordingly, this Court turns to

the claims relating to the alleged ineffective assistance of counsel relating to the decision to plead guilty.

### A. Standards for Ineffective Assistance Relating to a Decision to Plead Guilty

To prevail on a claim of ineffective assistance of trial or appellate counsel, a Defendant must meet the two-part test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Strickland*'s two-part test requires a Defendant to demonstrate that counsel's performance was deficient and that "there was a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* However, if a claim fails to satisfy the prejudice component, the court need not make a ruling on the performance component.

The two-pronged *Strickland* test is applicable to ineffective assistance of counsel claims arising out of the plea process. *Hill v. Lockhart*, 474 U.S. 52, 57 (1985). As applied to pleas, the first prong of *Strickland* remains the same in that the attorney's conduct must fall within the range of reasonable conduct. *Hill*, 474 U.S. at 58. Counsel owes a lesser duty to a client who pleads guilty than to one who goes to trial, however, and in the former case, counsel need only provide his client with an understanding of the law in relation to the facts, so that the accused may make an informed and conscious choice between entering a guilty plea and going to trial. *Wofford v.*

*Wainwright*, 748 F.2d 1505, 1508 (11th Cir. 1984). To impart such an understanding to the accused, counsel merely must make an independent examination of the facts, circumstances, pleadings and laws involved, and then offer counsel's informed opinion as to the best course to be followed in protecting the interests of the client. *Id.*

The second prong of the *Strickland* test focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. *Hill*, 474 U.S. at 59. In other words, in order to satisfy the prejudice requirement, a defendant claiming ineffective assistance of counsel during the plea process must show that there is a reasonable probability that, but for counsel's errors, he would not have pled guilty and would have insisted on going to trial. *Id.* The best way to evaluate whether there is a reasonable probability a Defendant would have insisted on going to trial is to determine whether that Defendant had available a defense that would likely have borne fruit at trial. *Upshaw v. United States*, No. 2:07-cv-111, 2008 WL 638261, at *1 (M.D. Fla., Mar. 5, 2008) (citing *Hill*, 474 U.S. at 59).

For the reasons that follow, this Court concludes that counsel's performance was not deficient under *Strickland* and that any errors by counsel did not prejudice Mr. Holley.  That is, there is not a reasonable probability that defendant would have insisted on going to trial but for whatever errors counsel made.

## B. <u>The 2001 Sexual Battery Allegation</u>

We begin with counsel's decision not to return to the Court to challenge Mr. Holley's pretrial detention with the actual information from the 2001 arrest of Mr. Holley in Walton County.  Mr. Holley argues that a "proper resolution of this matter was essential to Mr. Holley's case" for these reasons:

> Not only would evidence that this allegation was false possibly affect the Court's decision regarding whether or not to release Mr. Holley pending trial, but by remaining unchallenged, it had the effect of precluding Mr. Holley from raising an entrapment defense to the charge, as it suggested that he was predisposed to commit this type of offense.

ECF No. 57, at 16.  For the reasons that follow, this Court finds that this decision was a reasonable strategic decision and did not prejudice Mr. Holley.

As noted above, Mr. Holley argues that Mr. Burns's decision to not reopen the detention hearing with the actual facts of the 2001 arrest amounted to ineffective assistance of counsel.  This Court disagrees, because the actual documents would not have been likely to produce any different result.  First, while the fact that the accusation did not involve a knife or a minor would be better for Mr. Holley, the documents still show an accusation that he forcibly raped a women he had just met on the Internet.  This would hardly help in overcoming the presumption of detention from § 3412.

Counsel indicated at the evidentiary hearing that he explained as such to his client:

> [O]nce reviewing that report, it's: Mr. Burns, if you could bring something favorable – there's nothing favorable according to that arrest report, other than the fact it was nolle prossed and the victim did not want to cooperate with the State.
>     Because realistically, from my understanding, the victim saying that the reason they were leaving is because they were being threatened, or whatnot, or they were trying to explicit -- get some money after Mr. Holley, and he didn't have it. But the reality of it is, the report that I saw, I -- when Judge Smoaks said, okay, I'm keeping him here under this box, because I'm going to do it by it itself, okay, there's nothing extremely favorable to Mr. Holley that was going to change that judge's decision that would lead me to believe I should bring that motion -- I should renew a motion.

ECF No. 85, at 167.

Second, although the records show that the case was nolle prossed, the records from Walton County also show that the authorities took the accusation seriously enough that Mr. Holley was arrested, a case number was assigned, and Mr. Holley was required to plead and post bond.   Also, counsel had already informed the Magistrate Judge that the case was nolle prossed, so actually producing the documents would have had little effect in this regard.   This is especially true since the Magistrate Judge indicated that he

was detaining Mr. Holley based on the allegations in the instant case alone.
ECF No. 57 attach. M, at 14.

Third, in the evidentiary hearing, counsel indicated that, despite Mr.
Holley's detention, he was able to have multiple, prolonged meetings with his
client.  ECF No. 85, at 51.  Also, during the plea colloquy, Mr. Holley
indicated that he had had "sufficient time to talk with [his] lawyer" and that
his lawyer answered all his questions.  ECF No. 37, at 12.  He also answered
"yes" when asked by the Court, "Are you fully satisfied with the advice you
lawyer has given you?" *Id.*  Counsel also stated at the plea colloquy that he
had had enough time to talk with his client.  *Id.* at 12–13.  He also indicated
that "I've gone over all the discovery with him that he wanted to see." *Id.* at
13.  Counsel also testified during the evidentiary hearing about the process
he followed in discussing the discovery, the government's case, the case law,
and the elements of the statute with his client.  ECF No. 85, at 49–51:

> Well, first of all, I would let him look at it all and just
> absorb it, just like I would do myself. I would read
> through it all. More likely than not, my -- the way
> that I would have done it, I would have pull[ed] the
> statute that he was indicted under, which I have a
> copy of. So I would have looked at the statute, read
> the statute, reread the statute. You know, oftentimes
> I might go to the jury instructions, if there's a specific
> jury instruction on a case, and review the elements
> that the Court's going to instruct the jury on to prove
> the statute. You know, I'd look at those two things in
> conjunction, you know. And then I try [to] let a

> defendant absorb things, read them, you know, take
> it in for themselves, and then read the statute to
> them, go through the statute, and then look at
> whether or not -- what are the possible defenses, or
> not, to the –
>
> [after a question from counsel for Mr. Holley]
>
> Well, in this case, I think that it was done over a
> period of time. There was multiple visits to him.
> There was a large packet of discovery that he had to
> absorb, okay, that he couldn't -- you know, I did meet
> with him for prolonged amounts of time.

In fact, Mr. Burns testified that "over a period of Saturdays, [he] was meeting with Mr. Holley and reviewing things with him." *Id.* at 91. He testified that he chose Saturdays, "so that [he] could spend more time with Mr. Holley." *Id.* at 92. Thus, the argument that the detention prevented Mr. Holley from meeting with counsel and participating in his own defense is without merit.

Fourth, the quote above from the evidentiary hearing, *id.* at 167, reveals that counsel had the 2001 arrest report and discussed it with his client during their discussions about whether to plead guilty. Thus, counsel and Mr. Holley should have been aware that no minor was mentioned in the report and would have known they could rebut any argument that the arrest report showed that he was predisposed to commit sex acts against minors. Additionally, nothing in the Statement of Facts or the Presentence Investigation Report showed that the parties or the Court were relying upon the fact that a minor was involved in the 2001 incident. Thus, Mr. Holley's

concern, ECF No. 57, at 16, that the arrest report precluded an entrapment

offense is without merit.

Finally, it appears that the Magistrate Judge that prepared the Report

and Recommendation misapprehended the arrest report and complaint

affidavit mentioned in the detention hearing.  In the Report and

Recommendation, the Magistrate Judge stated as follows:

> It is with some concern that the court has examined
> the Government's representations to the court, as
> well as its written submissions in this case. First, the
> handling of Mr. Holley's detention hearing and the
> representations surrounding the incident in 2000 are
> disquieting. Although no evidence has been
> introduced, there has been more than a suggestion
> the alleged incident involved neither a minor nor
> violence. In any event, the record should have been
> clarified.

ECF No. 91 at 27.  This statement is imprecise.  First, it is wrong that "no

evidence ha[d] been introduced"; the arrest report and complaint affidavit are

included as attachments N and O, respectively, to ECF No. 57.  Second, the

incident was in 2001, not 2000.  Third, the arrest report and complaint

affidavit allege that violence was involved in that he allegedly held the victim

down while he forcibly raped her.  Fourth, the record has been "clarified" in

that (1) defendant and his counsel had the report as they discussed whether

to plead guilty and knew that no minor was involved and that it had been

nolle prossed, ECF No. 85, at 167; and (2) Mr. Holley was able to inform the

court, ECF No. 57, that the victim of the 2001 incident was nineteen at the time, *id.* at 16.

Finally, Mr. Holley attempts to prove too much when he deems the government's conduct at the detention hearing "disquieting", ECF No. 91, at 27, or "a case of intentional prosecutorial misconduct", ECF No. 57, at 11. During the detention hearing, the prosecutor candidly advised the Court that she did not have the details of the 2001 arrest several times:

> We do not know what happened to those charges. I don't know if he was arrested and then they were later dismissed, or what have you.

> However, I don't want to mislead the Court. We do not know the resolution of that particular case. I don't know if he was arrested and later released. I don't know if charges were ever brought and it was later nol prossed.

> And I don't know that Mr. Burns is not correct in saying that it was nol prossed.

ECF No. 57 attach. M, at 6, 7, 12.  The prosecutor then twice asked the Court to not rely upon her representations:

> And just to be clear, separate and apart from whatever happened in 2000, the government is of the opinion and asks for detention based on the facts of this case.

> So just to be clear for the record, Your Honor, you're detaining him today based on the allegations in this case and the punishment he is facing in this case without consideration to what may or may not have occurred in 2000?

*Id.* at 14.  Thus, while the statements by the prosecutor were unfortunate, the prosecutor made sure their impact was limited.  The Magistrate Judge at the detention hearing recognized this, stating, "I'm not suggesting anybody said anything incorrect today. We're just guessing."  *Id.* at 12–13.

## C. <u>Sufficiency of the Evidence</u>

Mr. Holley was charged of attempting to violate 18 U.S.C. § 2422(b). The statute provides:

> Whoever, using the mail or any facility or means of interstate or foreign commerce, or within the special maritime and territorial jurisdiction of the United States knowingly persuades, induces, entices, or coerces any individual who has not attained the age of 18 years, to engage in prostitution or any sexual activity for which any person can be charged with a criminal offense, or attempts to do so, shall be fined under this title and imprisoned not less than 10 years or for life.

18 U.S.C. § 2422(b). Thus, the government would have had to prove that (1) Mr. Holley "acted with the specific intent to persuade, induce, entice or coerce [Rhea] to engage in criminal sexual activity," and (2) "took a substantial step toward the commission of the underlying crime[ ]." *United States v. Yost,* 479 F.3d 815, 819 (11th Cir. 2007). "The underlying criminal conduct that Congress expressly proscribed in passing § 2422(b) is the persuasion, inducement, enticement, or coercion of the minor rather than the sex act

itself." *United States v. Rutgerson*, 822 F.3d 1223, 1232 (11th Cir. 2016) (quoting *United States v. Murrell,* 368 F.3d 1283, 1286 (11th Cir.2004)).  Mr. Holley argues that "the evidence presented by the Government was simply insufficient to support either element of an attempt to entice a minor."

### 1.  <u>The specific intent to persuade, induce, entice or coerce a minor to engage in criminal sexual behavior</u>

Mr. Holley argues that the Government could not establish that he acted with the specific intent to entice "Rhea."  Mr. Holley then offers the following less-than-complete description of the interactions between the agent and Mr. Holley:

> In fact, Mr. Holley goes to great lengths to avoid having conversations about sexual activity with the purported minor. It is Investigator Willis that tries repeatedly to get Mr. Holley to offer some type of explanation regarding the type of behavior he wishes to engage in with the minor. Mr. Holley never attempts to get "Rhea" to agree to anything, other than opening the garage door and keeping their conversations private.

ECF No. 57, at 25.

This passage is simply misleading.  As to the last sentence, Mr. Holley fails to mention that Holley persuaded Rhea to agree to go into the hot tub with him "Naked, you sitting in my lap, kissing me"; repeatedly got her to promise to answer the door in her bathing suit, ready to "hit the hot tub" with him; and got her to promise to let him to teach her "to suck."

Moreover, Mr. Holley also took several other steps to entice or persuade the thirteen-year-old "Rhea" to follow through with the encounter.  First, he highlighted his sexual experience and states that being with older partners is desirable at her age.  For example, he bragged that he does not even know how many women he has been with.  Later, he advised that sex in a hot tub is "not as good as you would think."  He then promised to teach her how to perform oral sex.  He later advised her about whether she might like vodka: he advised that she might only like it mixed, not straight.  He also told her that he always hung out with "20-30 yr olds @ your age" and later explained that "I was hanging out with fucking 20 and 30 year olds all day every day because they were a lot cooler than the little fucking minions that I was going to school with." This implies that hanging out with him—a thirty-three-year-old man—would be "a lot cooler" for her than hanging out with her fellow thirteen-year-olds.  A reasonable jury could conclude that all of these statements were intended to persuade or entice the minor to go through with the sexual encounter because of Mr. Holley's experience.

Second, Mr. Holley told her that he wanted to make the encounter good for her.  After he warned her that sex in a hot tub might hurt her and she said, "i want it 2 b good 4 u", Mr. Holley responded, "No i want it to be super good for you!" Also, after discussing the plan to jump right into the hot tub after he would arrive, he made sure it sounded great to Rhea.  ECF No. 57

attach. C, at 6.  He later promised that they would have a "good time" and that he "would love seeing [her] that's why [he was] driving." ECF No. 57 attach. G, at 2.  He also asked her if she would like him to stay the night.  A reasonable jury could conclude that he made these statements to entice or persuade her to carry through with the encounter because of Mr. Holley's expressed concern for her and desire to make the sexual encounter good for her.

Third, Mr. Holley repeatedly promised that he would never hurt her and that he was different from, as he put it, the "sick people out there."  At one point, he worried that if they had sex in the hot tub, he "may hurt [her] fresh lil pussy with [his] cock."  ECF No. 57 attach. A, at 7.  He also promised that he would never hurt her, stating "I've never hurt a girl in any way in my life.  You're just fine with me angel."  *Id.* at 6.  Also, when Rhea asked Mr. Holley if he wanted to get her in trouble, he promised that he would not and proposed parking in the garage to avoid her getting caught.  ECF No. 57 attach. C, at 4.

He also attempted to distance himself from other dangerous people she could meet online by imploring her not to hook up with anyone she met online other than him.  He stated at one point, "I'm really easy goin and NOT some sick perv", ECF No. 57 attach. A, at 6, and at another point, "I'm so thankful that you fucking got with me instead of some other…crazy mother

*Case No: 5:12-cr-00025-MW/CJK*
*Case No. 5:14-cv-00034-MW/CJK*

fucker or some shit", ECF No. 57 attach. G, at 6. He then warned her again that Craiglist.com might be full of "weirdos," "psychopaths" and "serial killers." *Id.* A reasonable jury could conclude that Mr. Holley made these statements to persuade or entice the minor to follow through with the encounter by allaying her fears that he would harm her (other than by having sex with her while she was a minor).

Fourth, every time that Rhea acted as if she doubted Mr. Holley's sincerity, he took great pains to convince her that he was sincere in his intent to come see her. On Friday night, a few hours before he left to drive to Rhea, Mr. Holley again expressed concerns that he was scared to go to jail. ECF No. 57 attach. A, at 9. After Rhea asked him whether he thought they should see each other, Mr. Holley insisted that he was going to "ride out", remarking "Lol want to c you badly!" *Id.* Later, when he had not left by 9:57 p.m., Rhea complained that she thought he was not going to come, and he replied, "Oh baby you should know better than that I mean I want to see you so bad." ECF No. 57 attach. G, at 1–2. Again, after his car broke down, he called Rhea, and she asked him whether he was "just not wanting to come." ECF No. 57 attach. H, at 1. Mr. Holley strenuously denied that, saying "Oh my God hell no" and that he would even take a picture of his car on a jack in the parking lot and send it to her to prove his sincerity. *Id.* He stressed that he "want[ed] to get up there so bad shit." *Id.* Finally, after Rhea asked if he

could come tomorrow, he texted that "[a]s soon as i get my car fixed i will be RIGHT THERE babygirl!"  ECF No. 57 attach. A, at 11.  A reasonable jury could conclude that Mr. Holley made these statements to persuade or entice her to follow through with the encounter by convincing her that he was not just stringing her along and that she should not turn her attentions elsewhere.

Mr. Holley and the Magistrate Judge conclude that because Rhea appeared to be willing to engage in sexual activity from the outset, Mr. Holley could not have intended to cause her to assent to that activity.  For example, while the Magistrate Judge agreed with the government that the communications between Mr. Holley and Rhea showed a "willingness, if not also an intent, on Defendant's part to engage in unlawful conduct", he also concluded, "[n]evertheless, such comments are decidedly less persuasive if one is actually looking for proof of the statutory requisite that Defendant intended to cause assent of the part of the minor rather than the other way around." ECF No. 91 at 40–41.  Also, Mr. Holley argued that "one cannot logically 'persuade' someone to do something that the person is already protesting an overweening passion for doing and for doing as soon as possible." ECF No. 34 Exh. 1, at 3.

This argument has been expressly rejected by the Eleventh Circuit.  In *United States v. Rutgerson*, 822 F.3d 1223, 1232 (11th Cir. 2016), the defendant argued that an under-aged prostitute who held herself out for sex could not be induced within the meaning of § 2422(b) because she obviously was already willing to have sex with "anybody who paid her price." *Id.* at 1233. The *Rutgerson* panel rejected this argument for two reasons.  First, the panel noted that the defendant's "offer of money was a clear attempt to persuade, induce, or entice her into having sex with him." *Id.*  But the panel went further and held the following:

> Nor was the offer of money the only means by which Rutgerson attempted to persuade, induce, or entice Amberly. He also engaged in explicit sexual dialogue, including telling Amberly that he "want[ed] her to cum too," and repeatedly asked what sex acts she would assent to and what she enjoyed. A reasonable jury could interpret this dialogue as suggesting that Rutgerson was trying to persuade Amberly that she would enjoy having sex with him, thus further enticing her into agreeing to have sex with him.

*Id.*

If a defendant can still persuade, induce, or entice a prostitute actually advertising for sex then Mr. Holley can still have intended to do so with Rhea.  Also, as described above, Mr. Holley used four techniques similar to that mentioned in *Rutgerson* to attempt to persuade, induce, or entice Rhea to follow through with the illegal sexual activity.  In fact, by promising Rhea

that he wanted it to be "super good" for her, he used the very technique

mentioned in *Rutgerson*.

Also, both Mr. Holley and the Magistrate Judge made much of the

comments relating to non-sexual activities by Mr. Holley like the following:

> "I might come by an chill for a min, watch a movie r
> something" ECF No. 57 attach. A, at 2;
>
> "I'm just going to have to meet you and hang out and
> stuff" ECF No. 57 attach. B, at 3;
>
> "Well I'll hang out with ya to see what's up" ECF No.
> 57 attach. B, at 4; and,
>
> When asked his favorite things to do: "Lots of things!
> Drink play pool swim play guitar. Chill watch movies.
> All kinds of stuff!" ECF No. 57 attach. A, at 5.

For example, Mr. Holley argues that "It was Investigator Willis who

struggled to get Mr. Holley to mention anything that had to do with anything

other than simply hanging out, playing pool, or watching a movie." ECF No.

57, at 19.  This argument ignores the fact that each of the statements above

was directly related to Mr. Holley expressing concern that the encounter

might be a police sting.  Also, each was followed with a statement like these:

> "We'll see where it goes when i arrive."  ECF No. 57
> attach. A, at 2;
>
> "Guess we'll have to see! ;-)"; ECF No. 57 attach. A, at
> 4;
>
> After stating that he that he would just hang out, he
> then stated he wanted "to figure things out you know

> what I'm saying" and laughed.  ECF No. 57 attach. B,
> at 4; and
>
> "We'll see how things go ;-)"  ECF No. 57 attach. A, at
> 6.

In short, the proximity of the comments about non-sexual activities to Mr. Holley's stated concerns about this being a police sting, coupled with the statements hinting at sexual activity once he feels "safe", could lead a reasonable jury to conclude that Mr. Holley made the non-sexual statements merely to protect himself.  The jury could reasonably conclude that they do not indicate a lack of intent to persuade, induce, or entice the child to engage in sexual activity.  In fact, given the overall tenor of the communications—including discussion of his penis size, her breast size and measurements, both of their sexual histories, the hot tub, his offer teach her to suck, the risk he knew he was taking, and his frequent admissions that his conduct was unlawful—it would be unlikely for a jury to conclude that he was saying those things and taking those risks simply to play pool or watch a movie with a thirteen-year-old girl.

The defendant in *Rutgerson* made a similar argument.  When the defendant was arrested, he was asked if he knew he was going to have sex with a fifteen-year-old girl.  Rutgerson replied that he did not know what was going to happen until he got there and that he "was just coming to hang out,"

but that "nine times out of ten that's what happens." *Rutgerson*, 822 F.3d at

1229.  The panel nevertheless found that he had the requisite intent.

### 2.  <u>A substantial step toward the commission of the underlying crime</u>

As Mr. Burns noted, because Mr. Holley was charged with attempt, the

government must prove that he "made substantial efforts to attempt to entice

a person that either was under the age of 16 or was an undercover officer

posing as a person under the age of 16 … into sexual activity." ECF No. 85, at

53–54.   Mr. Burns also indicated that he understood that, with regard to

intent, the government must prove that the defendant intended to cause

assent on the part of the minor, not that he acted with the specific intent to

engage in sexual activity. *United States v. Lee*, 603 F.3d 904, 914 (11th Cir.

2010).  Thus, Mr. Burns stated the question as, "Did he know that this person

was under 16? Did he make, you know, the efforts through electronic

communication, and whatnot, to entice that person into sexual activity?" ECF

No. 85 at 53–54.  In other words, Mr. Burns understood that the government

did not have to prove that Mr. Holley took a substantial step toward having

sex with Rhea; the crime was already committed when he took substantial

steps to persuade, induce, or entice her to engage in illegal sexual activity.

Mr. Burns understood and communicated that to his client.  When

asked what evidence he discussed with Mr. Holley that would substantiate

the substantial step element, he responded as follows:

> Well these text messages, his conversations back and
> forth with the person discussing this, planning
> specific date, getting in the car and going to towards
> Panama City … you know speaking to the officer,
> telling the officer here what he was planning to do.

ECF No. 85, at 80–81.[17]  This closely tracks the language from *United States*

*v. Murrell*, 368 F.3d 1283, 1288 (11th Cir. 2004):

> To find that a substantial step was taken, the court
> must determine that the defendant's objective acts
> mark his conduct as criminal such that his acts as a
> whole strongly corroborate the required culpability.
> *United States v. Forbrich*, 758 F.2d 555, 557 (11th
> Cir.1985). Murrell's objective acts strongly
> corroborate his culpability and provide clear evidence
> that his conduct was criminal. Murrell (1) made
> several explicit incriminating statements to Detective
> Spector; (2) traveled two hours to another county to
> meet a minor girl for sex in exchange for money; and
> (3) carried a teddy bear, $300.00 in cash, and a box of
> condoms when he arrived at the meeting site. His
> actions, taken as a whole, demonstrate unequivocally
> that he intended to influence a young girl into
> engaging in unlawful sexual activity and that his
> conduct was therefore criminal. Thus, Murrell took a
> substantial step toward inducing a minor to engage

---

[17] Thus, the following statement by Mr. Holley is not supported by the record. "It appears that both parties believed that beginning to travel in the general direction of Panama City constituted the necessary 'substantial step' yet such travel cannot constitute a substantial step toward committing the offense." *See* ECF No. 57, at 25.  Mr. Burns's testimony at the evidentiary hearing made clear he understood the proper standard for a substantial step in this case.

*Case No: 5:12-cr-00025-MW/CJK*
*Case No. 5:14-cv-00034-MW/CJK*

in illicit sexual acts, thereby satisfying the second
element of criminal attempt.

*Id.*

For the reasons discussed above, *see supra* pp. 53–61, a reasonable jury
could find that Mr. Holley made statements to the agent posing as Rhea that
were intended to persuade, induce, or entice her into illegal sexual activity.
Also, the jury is entitled to rely upon the objective behavior of defendant—in
planning a specific time and manner of meeting Rhea, traveling towards
Rhea, and calling her on the way and when he broke down—as tending to
prove Mr. Holley's criminal mindset during the prior communications with
the agent.  *Id.*  Thus, as Mr. Burns stated, the communications themselves
sufficed as a substantial step toward the commission of the offense.  *See Lee*,
603 F.3d at 915 ("Lee's internet and telephone 'conversations ... went beyond
mere preparation,' and constitute a substantial step sufficient to support his
attempt conviction").

One point made by the Magistrate Judge needs to be addressed.  The
Magistrate Judge stated that "Mr. Burns'[s] revelation that he considered the
fact Mr. Holley's car broke down as a possible defense to the charge further
calls into question counsel's understanding of the elements of the charged
crime, discussed below."  ECF No. 91 at 23. The premise of this statement—

that Mr. Burns considered the breakdown a possible defense—is misguided.

Mr. Burns stated the opposite:

> Q. So if a person makes plans to meet an under aged person in another state for sexual intercourse, we'll call it, the fact that the plane doesn't ever take off, the crime has still been completed once those arrangements are made?
>
> A. Crime of intent would be.
>
> Q. Okay.
>
> A. That's what he was charged with.
> Like when a codefendant that -- to look up whether they can be considered, like in a case where there's two or three codefendants. Did he make any attempt to -- on his own to actually stop the crime? Say if he was involved in a robbery and there's three people. He's in the car, you know, he's the getaway guy. The two guys go in. Did he do anything? Did he ever actually stop -- go in there and try to stop the people from committing the robbery? No. You understand what I'm saying?
> His actions, even though they were involuntary, he never, you know, abandoned the crime on his own volition. He even stated to the officer what his intentions were that -- where he was going, what he was doing. There wasn't an abandonment on his volition.

ECF No. 85, at 190–91.  In other words, because the breakdown was not a

volitional act he cannot rely upon it to show abandonment.  Counsel then

went on to make the common sense argument that, sure, an attorney could

stand up and make any argument, but concluded that "the whole totalitary

[sic] of it was what do you believe the jury is going to come back with? The

jury is going to come back with a guilty verdict." *Id.* at 191. As noted above, counsel's testimony at the evidentiary hearing showed that he informed his client that the relevant inquiry is whether the communications to the agent showed a substantial step to complete the crime of persuading, inducing or enticing and that travel was not necessary. Nothing in the transcript casts doubt on that.

### D. <u>The Entrapment Defense</u>

Mr. Holley also argues that even if the evidence was sufficient to establish a violation of § 2422(b), he should not have been convicted because he was entrapped into committing the crime as a matter of law. Entrapment is an affirmative defense that requires (1) government inducement of the crime, and (2) lack of predisposition on the part of the defendant to commit the crime before the inducement. *United States v. Orisnord*, 483 F.3d 1169, 1178 (11th Cir.2007); *United States v. Ryan*, 289 F.3d 1339, 1343 (11th Cir. 2002). The defendant bears the initial burden of production as to the government inducement and he may meet this burden by producing any evidence that is sufficient to raise a jury question that the government "created a substantial risk that the offense would be committed by a person other than one ready to commit it." *Ryan*, 289 F.3d at 1343–44 (quoting *United States v. Brown*, 43 F.3d 618, 623 (11th Cir. 1995)). "The defendant

may make such a showing by demonstrating that he had not favorably received the government plan, and the government had had to 'push it' on him, or that several attempts at setting up an illicit deal had failed and on at least one occasion he had directly refused to participate." *United States v. Andrews*, 765 F.2d 1491, 1499 (11th Cir. 1985) (citations omitted).

The Eleventh Circuit in *Rutgerson* set out some "guiding principles" for evaluating an entrapment defense, including the principle that "[a] predisposition finding is also supported by evidence that the defendant was given opportunities to back out of illegal transactions but failed to do so." *Rutgerson*, 822 F.3d. at 1235. The panel in that case found that a variety of factors supported a finding that he was not entrapped: (1) Rutgerson made the initial contact; (2) Rutgerson readily proceeded to attempt to arrange a sexual encounter after being told repeatedly that the subject of that encounter was underage; (3) Rutgerson persistently pursued the subject over the course of three days; (4) Rutgerson did not back out of the meeting when given the chance; (5) Rutgerson did not hesitate about having sex with a minor; (6) Rutgerson repeatedly rescheduled the meeting; and (7) in spite of his expressed concerns that the encounter was a sting operation, Rutgerson continued to pursue it. The *Rutgerson* panel concluded with this language:

> The long and the short of it is that the government agents "simply provided [Rutgerson] with the

> opportunity to commit a crime" by posting the
> backpage ads, and his "ready commission of the
> criminal act amply demonstrate[d] [his]
> predisposition."

*Id.* at 1236.

Here, the first two factors are better for Mr. Holley than Rutgerson—the agent made first contact with Mr. Holley after seeing his Craigslist ad, and Mr. Holley originally stated that he did not want Rhea to call him because he did not want to go to jail. The remaining factors, however, weigh against Mr. Holley and overcome his entrapment defense.

First, the agent did not dictate the pace of the communications or inundate Mr. Holley with messages. Instead, Mr. Holley was given numerous delays in communication to contemplate what he was doing and to walk away or back out, but he simply declined to do so. When Rhea first told Mr. Holley that he was talking to a 13-year-old girl, she asked if Mr. Holley wanted her to call him. After Mr. Holley said no, the agent did not restart the communications with Mr. Holley, giving Mr. Holley the chance to turn away. Eighteen minutes passed with no prodding from the agent before Mr. Holley restarted the communications by messaging Rhea via Craigslist to call him. After another seven minutes passed without a response from the agent, Mr. Holley asked if Rhea was still there. Rhea responded that she would call Mr. Holley, but the agent did not immediately call. Mr. Holley communicated

that he was waiting, and sixteen minutes later, Rhea communicated that she had texted Mr. Holley and asked if he got it.  The two did not finally communicate substantively until almost an hour later.

After the two finished communicating that night around 3:00 a.m., Mr. Holley attempted to restart the communications the next day (Thursday) at 10:41 a.m., at 2:05 p.m., and then at 5:53 p.m., with no response from the agent posing as Rhea until after the third attempt.  The day after that, Friday, no communications occurred between the two until 5:45 p.m., when Rhea contacted Mr. Holley and asked "r u still coming?" Thus, he had another fifteen hours to contemplate his intentions, but did not back out.  Mr. Holley promised to ride out to see her.  Finally, on Friday night, Mr. Holley complained to Rhea that she "never answer[s] my phone when I call man", ECF No. 57 attach. G, at 1, and "Why won't you answer?", ECF No. 57 attach. A, at 11, showing that it was Mr. Holley, and not the agent, who was driving the pace of the communications.

That Mr. Holley continued to pursue a child—who responded to his sexually explicit ad, who he thought was thirteen, and who he thought was home alone—through all of these delays supports a finding of predisposition. As Mr. Burns correctly stated, the entrapment defense involves "whether or not a normal person under the circumstances once they found out the person

was 13, would they stop initiating the proceedings, would they stop would they just stop, but no he didn't he kept going forward." ECF No. 85, at 81. Here, Mr. Holley was given multiple long delays to reconsider whether he should persuade, induce, or entice a thirteen-year-old girl to have sex and he persisted in doing so.

Mr. Holley argues that Agent Willis's frequent requests for Mr. Holley to describe what he "wants to do" represented Agent Willis trying to goad Mr. Holley into wanting to have sex with the minor.  That is not a fair reading of the communications.  The agent was not trying to convince Mr. Holley to have sex with the minor; he was trying to get Mr. Holley to state his existing desires on record.  By the time the agent began asking such questions, it was over twenty-four hours since Mr. Holley and Rhea had made contact.  Mr. Holley had already indicated his desire to meet with the minor while her parents were gone.

That is, around two hours after he was first contacted by Rhea and told that she was thirteen, Mr. Holley stated that he "might come by and chill" and that they would "see where it goes from when [he] arrive[d]."  He directed her to call him, and minutes into the call, he definitively stated that he wanted to come see her.  ECF No. 57 attach. B, at 1.  None of his

communications after that showed any reluctance to have sex with her.  His

only reluctance was his fear that he would get arrested for it.

The first question by the agent asking what Mr. Holley "liked" or

"wanted to do" came over twenty hours later.  The agent asked, "ive been

thinkn alot about tomoro nite ;) what u want to do" ECF No. 57 attach. A, at

4.  This question does not encourage Mr. Holley to participate in anything; it

just seeks information about what he already intends.  The other four

questions asked by the agent are as follows:

> "well what ur fav thing 2 do? cuz i want us 2 have fun
> ;)" ECF No. 57 attach. A, at 4;
>
> "what do u want 2 do tomoro? im getting excited ;)"
> ECF No. 57 attach. A, at 5;
>
> "well what ur fav thing 2 do?" ECF No. 57 attach. A,
> at 5; and
>
> "I don't know you tell me what is the plan?" ECF No.
> 57 attach. C, at 3.

None of these questions encouraged any activity; they merely attempted to

get the defendant to disclose on the record what his already existing desires

were.  Thus, they do not represent the government pushing the crime on Mr.

Holley or inducing the commission of the crime.  *See Rutgerson*, 822 F.3d at

1234.

Second, the agent posing as Rhea expressly gave Mr. Holley easy ways

to back out of the encounter.  During the initial texting, after Mr. Holley

expressed his concern that this might be a sting operation like the ones depicted on television, the agent sent the following: "oh, ive never seen those, well im not one of them but if u dont feel comfortable with comin 2 c me i respect that you got ur reasons :(". ECF No. 57 attach. A, at 2. Two texts later, the agent texted about why she thought he wanted to come over, and concluded with "but if u don't that's cool i guess." *Id.* Mr. Holley did not withdraw from the communications after these statements.

Later, when he was getting ready to leave to visit her, Mr. Holley told her he was still coming but that he was scared about going to jail. Rhea replied "I really want 2 c u but i don't want to be scared, do u think we shuld c each other?" *Id.* at 9. Mr. Holley responded that that question made him feel like she was not fake or trying to set him up. He promised that "yeah i'm gonna ride out." *Id.*

Then, as he was leaving, he called her. She asked why he had not left earlier and stated that she thought he was not going to come. ECF No. 57 attach. G, at 1. Rather than coming to his senses and saying that he was not coming, he instead stated "Oh baby you should know better than that I mean I want to see you so bad." *Id.* at 2. Later, when he still had not arrived by 11:10 p.m., he texted her and asked why she did not answer her phone. ECF No. 57 attach. A, at 11. She responded "sorry but i think ur just playn games

with me, i waited 4 u all day, i guess it just wasn't meant 2 b :(" Mr. Holley

still did not stop.  He called and insisted that he wanted to see her, offering to

send her proof that his car was broken down, ECF No. 57 attach. H, at 1, and

later texting that he would be right there as soon as his car was fixed, ECF

No. 57 attach. A, at 11.

Third, Mr. Holley repeatedly expressed his concern that his conduct

was illegal and that this was a police sting. Yet he continuously pursued a

sexual encounter with a person he believed to be a child.  The *Rutgerson*

panel cited *United States v. Lee*, 603 F.3d 904, 915 (11th Cir. 2010) for the

proposition that a defendant's concern that the online person that defendant

intends to have sex with is part of a sting operation supports an inference of

guilt because a relationship with an adult would not have concerned law

enforcement. *Rutgerson*, 822 F.3d at 1235.

Finally, everything in Mr. Holley's communications with the agent

showed that he was readily willing to have sex with a 13-year-old girl but for

the possibility of being arrested.  Even where he declined to meet with her, he

only did so because he did not want to go to jail.  ECF No. 57, at 1.  He did

not express any moral reservations about the sexual encounter.  Even when

he warned her about the dangers of visiting internet dating sites at her age,

his expressed concerns were that she would be physically abused or killed.

He considered himself different because he merely wanted to have sex with her; he was not a "sick perv" like those that would want to go further and physical abuse or kill her.  *See, e.g.*, ECF No. 57 attach. A, at 6.

For these reasons, this Court concludes that the evidence available to Mr. Burns and his client would have caused reasonable counsel to advise that an entrapment defense was unlikely to succeed at trial.  A jury would almost certainly find that the government agents simply provided Mr. Holley with the opportunity to commit a crime by responding to his Craigslist ad as a 13-year-old girl, and his ready commission of the criminal act—despite frequent delays, opportunities to withdraw, and suspicions that the encounter was a police sting—amply demonstrated his predisposition.

### E. The Decision Not to Investigate the Older Women Preference

Mr. Holley argues that counsel was ineffective for failing to investigate whether evidence existed that Mr. Holley preferred older women.  According to Mr. Holley, this evidence would be relevant to two arguments.  First, it would explain that the statement in his Craigslist ad that "age did not matter" was not an attempt to cause minors to respond.  Rather, it was intended to inform women older than him to not hesitate to contact him; he was willing to have sexual encounters with them.  Second, Mr. Holley asserts

that he was going to visit a 48-year-old woman in Fort Walton—and not Rhea—on Friday, June 15th.

The testimony at the evidentiary hearing, however, shows that counsel did not ignore either of these arguments, he just realized they did not change the likely outcome.  With regard to the Craigslist ad, counsel correctly realized that even if Mr. Holley proved that he was not intending to solicit minors with the ad, the rest of the evidence showed that he later knowingly attempted to entice a minor to have sex with him, after being told the age of the person and after being given multiple chances to change his mind.  After being asked whether it would be important show that Mr. Holley intended the language in the ad to target older women, counsel responded:

> No, not given the statements that he made in the text messages to the officer, no.

ECF No. 85, at 59.  He was later asked again whether the explanation that the advertisement targeted older women was extraneous.  Counsel responded:

> I believe that under the circumstances that what they had with him, the evidence that they had about whether or not he was soliciting someone under 16 years old was somewhat overwhelming, that this statement, or his explanation [that his advertisement only targeted older women], was not going to overcome the evidence that the federal government would be able to present.

ECF No. 85, at 61.

*Case No: 5:12-cr-00025-MW/CJK*
*Case No. 5:14-cv-00034-MW/CJK*

Also, counsel did not think he would be unable to find evidence to support this argument.  Instead, he assumed they could obtain and present evidence that he preferred older women and make the argument at trial:

> So realistically, you know, is it something to take into account? Most definitely if we go to trial. Should I do anything about it? You know, I had the discussion with him to help him make an intelligent decision whether or not, you know, we would present that at trial. I mean, and he would have had the full ability to do that if he would have went to trial.

*Id.* at 64.  Counsel was aware of this argument, assumed he would be able to support it at trial, but determined it did not tip the balance toward going to trial rather than pleading.  This strategic advice of counsel was a reasonable assessment of the case against Mr. Holley.

With regard to his second argument—that he was intending to visit a 48-year-old girlfriend on Friday, June 15th—Mr. Holley's own submissions call his argument into question.  In his Reply, ECF No. 41, Mr. Holley claims that he was not traveling to meet Rhea but instead to meet a 48-year-old female:

> Petitioner clearly and honestly states to Officer Nelson in Gulf Breeze that he was "headed to Fort Walton to get a piece of ass."   Attached (Exhibit E) is the police report the prosecution is using to accuse Petitioner of "traveling" and satisfying the substantial step element necessary for an attempt violation. Also attached (Exhibit D)is the call logs to the 48 year old female Petitioner was traveling to, intending on, and attempting to meet.

*Id.* at 4. The call logs mentioned in that reply purport to cover the calls made and received on Mr. Holley's cell phone for a time period from late Tuesday, June 12, 2012 (which is before he began communicating with the agent posing as Rhea) to Sunday, June 17, 2012.[18]  During that time period, Mr. Holley did not call the number he marked as that of the 48-year-old until 4:00 a.m. on Sunday, June 17, 2012.  That is, no calls were made to that number to set up any encounter in Fort Walton from Tuesday to Friday of that week, no calls were made to her that Friday to indicate he was leaving to Fort Walton, and no calls were made once he broke down that Friday night and would have "stood up" the 48-year-old.  In comparison, the same records show twelve calls or attempted calls between Mr. Holley and Rhea during preparation for the trip, as he left town, and once he broke down.  *Id.*  Counsel made the reasonable strategic decision that even if he could obtain witnesses to testify as to Mr. Holley's preference for older women, Mr. Holley's communications and actions would still show an intent and predisposition to persuade, induce, or entice a minor to engage in illegal sexual activity.

---

[18] The times given for the beginning of the calls in Exhibit D to ECF No. 41 are consistently around one hour and seven minutes earlier than the times for the calls in ECF No. 57 attach. A.

## F.  <u>Counsel's Knowledge of Federal Sentencing Law</u>

The Magistrate Judge opined that Mr. Burns was mistaken about various aspects of federal sentencing law.  A review of the testimony at the evidentiary hearing reveals, however, that Mr. Burns was not mistaken or that the mistakes did not prejudice Mr. Holley's ability to intelligently determine whether to plead guilty.  First, the Magistrate Judge stated without citation that Mr. Burns "suggested at one point that the plea agreement capped the sentence at ten years, although he receded from that position."  ECF No. 91, at 24.  The Magistrate Judge then set out Mr. Burns's statement that "the federal government didn't have to give me a plea agreement of ten years minimum mandatory. She could have gave me a plea agreement of 15, or she could have gave me one of a little bit higher than that . . . " *Id.* at 25 (quoting ECF No. 85, at 164).  The Magistrate Judge then concluded that this shows that Mr. Burns did not understand that the courts and U.S. Attorney in this district do not engage in plea bargaining.  *Id.*

The Magistrate Judge did not include testimony from the evidentiary hearing that showed that Mr. Burns thought just the opposite.  Mr. Burns testified that he knew that plea agreements do not bind courts in the Northern District, as shown by this colloquy:

> Q. Well, what was the plea to? What was the plea agreement?

A. To ten years. Ten years. Ten years.

Q. So it's your testimony that the plea agreement capped the sentence that Mr. Holley was facing to ten years?

A. It's my understanding that the -- that he was pleading guilty to the charge and that it wasn't a binding promise, but it didn't appear that he was going to be sentenced to more than ten years. The state -- the feds were not really seeking that. It's ultimately up to the judge, but they were not trying to sentence him to more than ten years or have him sentenced to more than ten years.

ECF No. 85, at 101–02.  He further clarified what he meant after he was

asked if he had spoken with the prosecutor about any agreement as to the

sentence:

Q. Sir, your recollection of your conversations with the prosecutor is that the Government wouldn't be seeking anything more than the ten-year mandatory minimum, but you don't have a specific agreement to the ten years? Is that correct, or am I incorrect?

A. I mean, in the course of practice of procedure in federal court, state court, and all, I mean, as lawyers, that's our word. I mean, she tells me she's not going to do that. You know, as an officer of the Court, a lady or gentleman, I can depend on that. I wouldn't expect her to do anything else. Because she's an attorney. She's a federal attorney. She's licensed in the United States Government. She tells me that's what she's going to do, why would I believe that she's going to do something else?

*Id.* at 141.  Thus, it is clear that Mr. Burns knew that the prosecutor was merely giving her "word" that if Mr. Holley plead guilty, the government would not seek more than the mandatory minimum.  He was simply not stating that he thought he and his client had negotiated a guaranteed sentence in the plea agreement.

The Magistrate Judge also stated that Mr. Burns wrongly used the term "statutory mitigating factors" to describe when a sentencing court can depart below a mandatory minimum sentence.  As the Magistrate Judge also stated, however, Mr. Burns (1) accurately described the situation to be when a defendant cooperates in the prosecution of another; and (2) recognized that such a departure was not possible in the instant case.  *Id.* at 157.  The Magistrate Judge also noted that when Mr. Burns was asked about parole, he did not appear to realize that parole has been abolished in the federal system. He stated that Mr. Holley would be eligible for parole "after, like, eight years."  Even though he was mistaken about parole existing, under 18 U.S.C. § 3624(b) federal prisoners are entitled to fifty-four days of gain time per year for "exemplary compliance with institutional disciplinary regulations."  Over ten years, this would result in Mr. Holley serving 8.5 years of his sentence, which comports with Mr. Burns's statement.  Thus, although he was

mistaken, the mistake would not likely affect Mr. Holley's decision to plead guilty.

Mr. Holley also found it "troubling" that counsel advised his client that it was "likely that the court would be bound by the mandatory minimum", stating:

> The fact that Mr. Burns stated that [it] was "likely that the court would be bound by the mandatory minimum," is troubling. It appears that Mr. Burns may have advised Mr. Holley that the possibility existed that the court could sentence him within the otherwise applicable guideline range. Clearly, Mr. Holley expected to receive a sentence within that range and he believed that the Court had the authority to go below a mandatory minimum sentence.

ECF No. 57, at 28–29.  The gist of the statement by Mr. Burns is correct; Mr. Holley was facing the mandatory minimum.   The problem is that by using the word "likely", Mr. Burns may have unintentionally communicated to Mr. Holley that there was a chance of escaping the mandatory minimum.  However, even if that were true at the time of the first sentencing, Judge Smoak gave Mr. Holley and Mr. Burns three weeks to confer and withdraw Mr. Holley's plea if he chose to.  ECF No. 38, at 11–12. At his second sentencing, Mr. Holley made clear that he understood he was facing the mandatory minimum and still

wanted to plead guilty.   ECF No. 36, at 3–4.  Thus, any
miscommunication by Mr. Burns to Mr. Holley on this issue was
harmless.

### G. <u>The Benefits of Pleading Guilty</u>

The reasonableness of Mr. Burns's advice to plead guilty was supported
by the benefits to Mr. Holley in doing so.  As an initial matter, Mr. Holley
literally faced life imprisonment for his offense.  Although the parties appear
to agree that a sentence approaching life was unlikely, the Court was within
its authority to sentence Mr. Holley up to life imprisonment if the factors in
18 U.S.C. § 3553 supported it.

Second, the government promised not to seek more than the mandatory
minimum if Mr. Holley pled.  If Mr. Holley had forced the government to
meet its burden at trial, he would have likely been unsuccessful in arguing
that the government entrapped him and that the government prosecutor
committed prosecutorial misconduct in the detention hearing.  If he lost, the
government could have sought more than the mandatory minimum.  Pleading
guilty avoided that possibility.

Third, one element of federal sentencing that no party has discussed is
the fact that if Mr. Holley had not plead guilty, he would not have received
the three-point reduction for accepting responsibility in a timely manner
under United States Sentencing Guidelines § 3E1.1.  If he claimed his

innocence at trial and required the government to prove its burden, he would

likely have lost that reduction.  This would render his offense level 30 and his

sentencing range 108-135 months, fifteen months of which is above the

mandatory minimum. Thus, pleading guilty had a real benefit to him by

reducing the risk that the Court would sentence him at the high end of the

Guidelines range and add over a year to what he actually received.

### H. **Mr. Holley's Right to Appeal**

As noted above, the government offered a concession that Mr. Burns

failed to consult with his client and thus is entitled to a belated appeal.

However, the government did so without much analysis; in its response to the

supplemental § 2255 motion, the government stated the following:

> In this case, defendant asserts that counsel failed to
> consult with him regarding his right to appeal
> following the pronouncement of sentence. (Doc. 57 –
> Pgs. 28-29). Based upon its communications with
> counsel, the government has no abiding conviction to
> the contrary.
>
> On the record before it, the government believes the
> Court could not safely conclude that defense counsel
> fulfilled his obligation to meaningfully consult with
> his client about an appeal, or to ascertain and follow
> his client's wishes. Therefore, regardless of whether
> an appeal would have been successful, or whether
> defendant would have chosen to file an appeal after a
> meaningful consultation with counsel, defendant is
> entitled to relief with respect to Claim C in his
> Supplemental Brief. (Doc. 57 – Pgs. 28-29).

This Court is not bound by the Government's concession. *See United States v. Lee*, 586 F.3d 859, 866 (11th Cir.2009) (citing *Roberts v. Galen of Va., Inc.*, 525 U.S. 249, 253, (1999)); *Wilcox v. United States*, No. 8:07-CR-163-T-27EAJ, 2011 WL 5975683, at *3 (M.D. Fla. Nov. 29, 2011).  As explained below, Mr. Burns did, in fact, sufficiently consult with Mr. Holley regarding his right to appeal, and Mr. Holley reasonably agreed with his advice to not seek direct appeal.

The Supreme Court has instructed that if a defendant specifically directs his attorney to file a notice of appeal, a lawyer who disregards this instruction acts in a manner that is professionally unreasonable. *Flores-Ortega*, 528 at 477 (2000) (citing *Rodriguez v. United States*, 395 U.S. 327 (1969); *Peguero v. United States*, 526 U.S. 23, 28 (1999)).  However, in cases where a defendant neither instructs counsel to file an appeal nor asks that an appeal not be taken, counsel's performance can still be constitutionally deficient if counsel failed in his or her duty to consult with the defendant regarding an appeal. *Id.* at 478.

The *Flores-Ortega* Court, however, rejected a rule that counsel has a constitutional duty to consult with the defendant about an appeal in all cases:

> We instead hold that counsel has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for

example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing. In making this determination, courts must take into account all the information counsel knew or should have known. Although not determinative, a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings. Even in cases when the defendant pleads guilty, the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights. Only by considering all relevant factors in a given case can a court properly determine whether a rational defendant would have desired an appeal or that the particular defendant sufficiently demonstrated to counsel an interest in an appeal.

*Id.* at 480. The first question, therefore, is whether Mr. Holley asked for an appeal; if not, the second is whether Mr. Burns had a duty to consult with his client about an appeal; the third is whether Mr. Burns did, in fact, consult with Mr. Holley; and the fourth is whether counsel failed in that duty, in that the consultation was deficient and prejudicial.

Mr. Holley appears to indicate that his counsel had not advised him of his right to appeal his conviction:

Petitioner's counsel was deficient under the Sixth Amendment in failing to advise Petitioner on his right to appeal, that he should file an appeal, and failing to file a notice of appeal on Petitioner's behalf.

ECF No. 34 attach. 1, at 13.  He then alleged that "[h]ad Petitioner been competently advised, he would have filed a Notice of Appeal." *Id.* at 14.  This language implies that Mr. Holley had never asked for an appeal and counsel had never consulted with Mr. Holley about his right to appeal the conviction itself.[19]  Later, however, in his affidavit attached to ECF No. 47, Mr. Holley stated that Mr. Burns had consulted with him about an appeal:

> The second time I saw Mr. Burns was in October 2012 when his whole story changed. Mr. Burns, after informing me of my zero chance of winning at trial, told me that he would not entertain the idea of filing an appeal because there was no use in doing so in the first place. . . . His position was clear and was simply: so long as he was my lawyer he was not appealing any case where the client pled guilty and that I was guilty and did not have any chance in the matter and must plead guilty. Hence, I could forget about any appeal of any sort. It was against his "policy."

*Id.* attach. 1, at 2.  Mr. Holley attached three other affidavits to ECF No. 47. Two of them did not mention anything about his right to appeal, and the third, his grandmother's affidavit, stated that she never discussed an appeal with Mr. Burns.  *Id.* attach. 2, at 2.

---

[19] Judge Smoak, at the February 2013 sentencing, informed Holley of his right to appeal his *sentence*.  ECF No. 36, at 12.  Also, during the plea colloquy, Judge Smoak informed Holley, "Now, if you plead guilty, you may be able to appeal your sentence if you're not satisfied with it. But you will not be able to take back your guilty plea. That will be a final decision today. Do you understand that?" ECF No. 37, at 6.

At the evidentiary hearing, Mr. Burns indicated that he had discussed an appeal or post-conviction relief with Mr. Holley twice.  The first occurred before sentencing:

> Q. Okay. So after the plea but before the sentencing hearing, you had conversations with Mr. Holley regarding appeal?
>
> A. Correct.
>
> Q. All right. And what did those conversations entail?
>
> A. Well, just like at the very beginning, you know, that our contract did not call for -- if he wanted me to do an appeal, that there be a further negotiation between the two of us and that the reality of it was, when I spoke to him, that I did not -- most specifically, you know, what would be the appealable issues in your case? Okay. One, was this -- is this an illegal sentence? Okay. Are you going to have an illegal sentence handed out to you? Is the law ambiguous, void for vagueness?

ECF No. 85, at 219.  Mr. Burns then testified that the only conversation post sentencing that he had with Mr. Holley concerning any appeal or post-conviction remedy occurred "some months" after sentencing.  *Id.* at 219–20. He testified that Mr. Holley "wanted to get a copy of his file so he could start investigating his case, post-conviction relief." ECF No. 85, at 219.

This Court concludes that both Mr. Burns and Mr. Holley agree that Mr. Holley did not ask Mr. Burns to file an appeal.  That is, both of them describe the communication in October of 2012 as Mr. Burns advising Mr.

Holley that an appeal should not be taken and Mr. Holley acquiescing in not asking him to file an appeal.  This is not the case of a defendant asking counsel to file an appeal and counsel simply forgetting to do so.  Both also agree that after judgment and sentencing, Mr. Burns did not consult with Mr. Holley about an appeal until "some months" had passed.  Thus, Mr. Holley could not have asked for an appeal during that time.

Since Mr. Holley did not ask Mr. Burns to file an appeal, the Court turns to whether Mr. Burns failed in his duty to consult with Mr. Holley about an appeal. The Court concludes that he did not.  Even though it was before sentencing, the October 2012 conversation between Mr. Burns and Mr. Holley informed Mr. Holley of all of Mr. Burns's arguments as to why an appeal would not be successful.  In that discussion, Mr. Burns was correct regarding the effect of the plea: "A guilty plea, since it admits all the elements of a formal criminal charge, waives all nonjurisdictional defects in the proceedings against a defendant." *United States v. Jackson*, 659 F.2d 73, 74 (11th Cir.1981), *cert. denied*, 445 U.S. 1003 (1982).  None of Mr. Holley's arguments involve jurisdictional defects, so the only way to attack the guilty plea is to allege that counsel was ineffective in recommending the plea be entered.

The Supreme Court has directed that such ineffectiveness claims are best first raised in a § 2255 motion:

> Applying the usual procedural-default rule to ineffective-assistance claims would have the opposite effect, creating the risk that defendants would feel compelled to raise the issue before there has been an opportunity fully to develop the factual predicate for the claim. Furthermore, the issue would be raised for the first time in a forum not best suited to assess those facts. This is so even if the record contains some indication of deficiencies in counsel's performance. The better-reasoned approach is to permit ineffective-assistance claims to be brought in the first instance in a timely motion in the district court under § 2255. We hold that an ineffective-assistance-of-counsel claim may be brought in a collateral proceeding under § 2255, whether or not Mr. Holley could have raised the claim on direct appeal.

*Massaro v. United States*, 538 U.S. 500, 504 (2003). Thus, Mr. Burns was correct in advising Mr. Holley that a direct appeal of his conviction would not be likely to achieve any substantial relief, and Mr. Holley is not entitled to a belated direct appeal of his conviction. This result is not necessarily a negative for Mr. Holley. If Mr. Holley is allowed to appeal the instant order by the Eleventh Circuit, Mr. Holley will be able to present the same arguments to the appellate court after having had "an opportunity fully to develop the factual predicate for the claim." *Id.*

## I.  <u>Certificate of Appealability</u>

To obtain a certificate of appealability under § 2253(c), a habeas prisoner must make a substantial showing of the denial of a constitutional

right, a demonstration that includes showing that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000).  Although the undersigned disagrees with the conclusions of the Magistrate Judge, the Magistrate Judge is an eminently reasonable jurist and the issues presented are adequate to proceed further.  Therefore, under 28 U.S.C. § 2253(c)(3), a certificate of appealability is granted for the following issues: (1) whether Mr. Holley's counsel rendered ineffective assistance such that he should be permitted to withdraw his guilty plea, (2) and whether Mr. Holley's counsel failed to properly advise him of his appellate rights such that the judgment should be vacated and a new sentence imposed so that Mr. Holley has an opportunity to appeal.

Accordingly,

IT IS ORDERED:

The amended motion to vacate, set aside or correct sentence, as supplemented (ECF No. 34, 57) is DENIED with prejudice.  A certificate of appealability is granted for the issues described above.  The Clerk is directed

to close the file.

      **SO ORDERED on November 7, 2016.**

                             <u>**s/Mark E. Walker**</u>
                             **United States District Judge**